# UNITED STATES *vs.* EDWIN W. POE, STUART S. JANNEY AND ERNEST J. CLARK, RECEIVERS OF THE UNITED SURETY COMPANY.

*Bonding Companies: voluntary dissolution; rights of policy holders; potential liabilities; deposits with State Treasurer.*

An order refusing a motion of *ne recipiatur* is not one from which an appeal is allowed.                                    p. 92

A decree for the dissolution, or of adjudication of insolvency of a company operates, between the company and its creditors, to determine its outstanding contracts.                p. 94

Where a bonding or surety company has not been declared insolvent, equity will not, in proceedings for its voluntary dissolution, pass any order which might have the effect of discharging it from its obligations upon which default has not occurred or been discovered.                        p. 94

Where a bonding company that has not been declared insolvent seeks voluntary dissolution, a pro rata part of its premium reserve necessary to protect its potential liability to its outstanding policy holders must be maintained.    p. 96

Creditors of such a company whose claims are liquidated, or which have been reduced to judgment, should not be subject by a Court of Equity to an indefinite postponement, in whole or in part, merely because of its potential liability to other outstanding policy holders.                          p. 96

The assets and choses in action of the company should be reduced to cash, and after reserving the sum necessary for the

protection of its potential creditors, and such further reserve as may be necessary for the creditors with unliquidated claims, the balance should be audited and distributed among the creditors whose claims are fully established.    .    p. 99

Should the assets in the possession of the corporation or the receiver not prove sufficient, *query,* whether some of the securities deposited with the State Treasurer should not be sold and the proceeds applied to the established claims of its policy holders.                                    p. 100

Where a surety company, organized for the purpose of acting as surety upon bonds of various descriptions, was in the hands of receivers and had not been dissolved or decreed insolvent, and an order was passed in the receivership proceedings providing for the filing of claims as of a certain date and excluding absolutely and for all time any claim which might thereafter arise, such order was reversed, as the effect of it would be to cancel upon a date certain all the existing obligations of the company.                            pp. 94, 100

The liabilities of the surety company in this case were divided by the Court into three classes: first, where defaults have already taken place upon bonds issued by the company and the amount of such defaults are liquidated; second, where the amount of such defaults are unliquidated; and third, the potential liability upon bonds upon which no known default has yet taken place and on which none may occur. Under these circumstances, the Court ordered that the assets of the company be reduced to cash and a sum therefrom equal to 60% of the annual premiums be reserved for the benefit of potential creditors, and such further reservation as may seem proper to the lower Court be made for the protection of unliquidated claims, and the balance be distributed among creditors whose claims are fully established.         p. 98

*Decided February 21st, 1913.*

Appeal from the Circuit Court of Baltimore City (HEUIS-LER, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*John Philip Hill,* for the appellant.

*Joseph C. France* and *Wm. L. Marbury,* for the appellees.

A brief for certain judgment creditors of the United Surtey Company was filed by *Wm. L. Marbury* and *Wm. L. Rawls* and *Semmes, Bowen & Semmes.*

A brief on behalf of the receivers was filed by *George R. Gaither, Joseph C. France* and *Ritchie & Janney.*

STOCKBRIDGE, J., delivered the opinion of the Court.

The present appeal is taken from a ruling of the Circuit Court of Baltimore City, refusing a motion of *ne recipiatur* with respect to a petition presented by the receivers in this case, and denying to the United States the opportunity to file an answer to such petition. There is also presented by the record for review in this Court the order of the Circuit Court passed on the 10th of October, 1912, and which order is as follows:

"Upon the petition of the receivers filed in this case, it is this 10th day of October, in the year nineteen hundred and twelve, by the Circuit Court of Baltimore City, adjudged and ordered:

1.   That February 15, 1913, is hereby fixed as the final day for the filing of claims in these proceedings by the bond holders, policy holders and creditors of the United Surety Company; and only claims filed on or before said day shall participate in any distribution of the assets of the company to be made to the creditors by the receivers.

2. That no default under any outstanding bond or guaranty of said company of any character occurring after the 13th day of January, 1913, shall give rise to a provable claim in any distribution of the assets of the company, to be made to the creditors by the receivers.

3. That the holders of outstanding bonds and guarantees under which no claim for loss is made, be and they are hereby authorized to file claims against the company for the amount of loss arising from procuring substitute bonds at prevailing rates, or for the unearned premiums.

If the holders of bonds guaranteeing the maintenance of construction or other work for a fixed period are unable to procure substitute bonds on such terms, they may claim under the provisions of paragraph 4 hereof.

4. That the holders of outstanding bonds and guarantees under which claim for loss is made, but such claim is unliquidated or not definitely ascertainable, be and they are hereby authorized to file for the penalty of the bond, in order that their claims may be subsequently considered and a proper reservation of assets made therefor, if and when the same are definitely established."

The first of the orders appealed from does not come within any of the classes of orders from which an appeal is allowed to this Court by the Code, and the matters included in the petition of the receivers, to which the motions referred to were filed, are entirely covered by the order of October 10th, also appealed from, and thus no discussion is necessary of the order denying the motion of *ne recipiatur,* and refusing the opportunity to answer the petition.

Stated in concise, untechnical terms, the effect of the order of October 10th, 1912, above set forth, was to terminate all liability of the United Surety Company upon bonds issued by it, as of the 13th day of January, 1913, and to exclude absolutely and for all time any claim which might

thereafter arise, and to establish the 15th of February, 1913, as the date for filing all claims against the assets of the corporation in the hands of the receivers. The order, therefore, was in effect a preliminary order for the distribution of assets among creditors. The corporation never having been dissolved, or adjudicated insolvent, the case presented is one for which this Court has been referred by the diligence of counsel to no precedent, nor, so far as the Court has been able to ascertain, does there exist a precedent for a case of this character. Any rule which may now be laid down must therefore be understood to be in the nature of a first impression under the facts and circumstances of this particular case, not necessarily binding upon it in a case arising under a different state of facts.

To avoid misapprehension, the facts as now presented to the Court disclose the following situation:

The United Surety Company is a corporation organized for the purpose of acting as surety upon bonds of various descriptions, such as public official bonds, bonds of executors and administrators, guardians, committees, trustees and receivers; bonds to secure the issuance of attachments, injunctions, appeals, and others commonly designated as judicial bonds, bonds of contractors, for construction, maintenance or the performance of work of various kinds. The business is in many respects similar to that conducted by insurance companies; but it is a character of insurance which has been in existence but a comparatively short time, most of the companies doing the business of this nature having been formed within twenty-five years. Companies formed for this kind of business have in some instances become insolvent, or have been dissolved and their business wound up by the action or under the supervision of Courts exercising an equity jurisdiction, but in this instance the corporation in question has not been dissolved, has not been decreed to be insolvent, and while certain of the principles which are applied in the case of payment of or distribution among the creditors of insolvent corporations may be made applicable

to the case of a corporation situate as is the United Surety Company, they can not be so adapted or applied in their entirety.  The effect of a decree of dissolution or of an adjudication of insolvency is undoubtedly to determine the outstanding contracts of a company, operating between the company and its creditors, as does the death of an individual between himself and his creditors, and for the very manifest reason that there has been a judicial determination of the impossibility of the performance by the dissolved or insolvent corporation of its contracts and engagements.  *Union Trust Co.* v. *Belvedere Co.,* 105 Md. 529.

The order now appealed from in terms proposes the like cancellation upon an absolute date named therein, of all existing obligations of the company.  These obligations, from the nature and character of the business conducted by the corporation, are in some respects peculiar to corporations conducting a surety business.  For purposes of illustration take a guardian's bond.  The object and purpose of it is to protect the interest of a minor with respect to funds in the hands of the guardian; the ward is of course not of age and may not come of age, so as to be able to maintain an action for a default upon that bond for a number of years.  A default may have actually occurred and yet the ward be in ignorance of the fact, not merely at the time of the actual default, but may have been on January 13th, 1913, and may continue to be so for still a considerable period of time.  No authority has been cited nor is any believed to exist which will go the extent that does the order in this case of declaring that a Court of Equity has the power, in the exercise of an *equitable* jurisdiction, to declare such obligation to be terminated and void because the ward who was designed to be protected, and who is without the legal capacity to take any proceeding, has not filed a claim with the receivers before the 15th of February, 1913, and similar illustrations might be given with most of the other kinds of obligations entered into by the company.  Growing out of such conditions there has arisen a practice, which has received the sanction of

enactment into law in a number of States, requiring the companies which do an insurance business to maintain what is called a. reserve or premium reserve, and in some instances several different and cumulative reserves for the purpose of insuring to the policy-holders the protection to which their contracts entitle them.

Turning to a different phase of this case, the following facts appear from the records in the present case, and in an earlier appeal in relation to this same surety company. Two years have elapsed since the appointment of the receivers. At the time of such appointment there were outstanding a large number of policies issued by the company having penalties aggregating approximately $70,000,000. During the administration of the receivers the contingent liabilities of the company upon policies issued by it, have been reduced by re-insurance, expiration or cancellation of the policies, so that at the present time there are outstanding potential liabilities upon but 2286 policies, with aggregate penalties of $9,571,250.48. As the potential or contingent liabilities of the company have decreased, there has been a corresponding decrease in the amount held in the premium reserve, the reduction being from $225,365.53 to $60,094.54. Of the assets as reported by the receivers at the time they took charge were the following items of importance: real estate (being the Home Office Building of the company) valued at $250,000, which still remains unsold in the hands of the receivers; $200,000, par value, of the stock of Baltimore City deposited with the State Treasurer, and which was the subject matter of a former appeal; $160,176.30 of premiums in the hands of agents for collection, and which after one year still appeared in their statement as $159,713.10, or a reduction during that year of $463.20, though the amount collected was probably somewhat larger than this, inasmuch as the receivers statement of receipts during their first year of administration reported $7,725.01 as received from agents. A portion of this may have been and probably was premiums collected by the receivers for the continuing of policies in

force, but manifestly there had been no material or substantial reduction during the year in the large amount due for premiums from agents of the company at the time of the appointment of the receivers. There was also a claim against the Munich Insurance Company arising out of the business relations between the United Surety Company and the Munich Insurance Company, which appears in the report of December 31st, 1911, as an estimated assets of $200,000, although it will probably eventually prove of much less value.

There is no statement contained in the records from which it is possible to arrive at even an approximate estimate of the liabilities of the United Surety Company, but it does appear that there are, or may be, liabilities of three different classes: 1st, where defaults have already taken place upon bonds issued by the company and where the party intended to be indemnified has recovered a judgment, or the loss has been adjusted for a definite amount between the receivers and the insured; 2nd, cases where default has occurred, but the amount of such default is unliquidated or uncertain; and 3rd, the potential liability upon bonds or policies issued by the company and upon which no known default has yet taken place, and with regard to the greater part of which in all probability no default ever will take place, and therefore no liability ever be incurred.

It will be evident from this statement that creditors of the company whose claims have been liquidated, or upon which judgment has been recovered, should not in a Court of Equity be subjected to an indefinite postponement of payment in whole or in part of their claims, because of the outstanding potential liabilities to other policy holders, and it is, therefore, proper and equitable that there should be such disposition now made of the assets of the United Surety Company in the hands of the receivers as will fully guard and protect the interests of each class.

This company, in common with other similar companies, throughout the time that it was issuing bonds or policies, and prior to the order of the State Insurance Commissioner

prohibiting the further issuance of obligations, maintained what was called a premium reserve; a term which is borrowed from the law of fire insurance and not entirely apposite in the case of a surety company because of the different conditions incident to the obligation assumed. This reserve is one required by statute in such States as New York and Massachusetts, with regard to certain classes of policies, and extended by the regulations of State Commissioners to nearly all insurance, and companies, wherever formed, which have desired or attempted to do business generally throughout the country have found it to their advantage to comply with those requirements. This premium reserve as carried by the United Surety Company was at the time the receivers took charge $225,365.53, as already noted, and had been decreased as the potential liability on policies was decreased, to $60,-094.54 at the end of December, 1911. This constitutes a fund originally intended for the protection of policy holders from the time of the issuance of their policies, and should therefore be maintained in the existing situation of the companys' affairs for the protection of creditors of the third class, or possibly be slightly increased.

The method by which this premium reserve is determined is not entirely clear; thus in States in which a premium reserve is provided by statute the rule adopted seems to be an arbitrary one of 50% of the amount of the annual premiums, and yet it may to some extent be based upon the results of insurance experience; thus if we take the published figures of the sixteen leading companies engaged in the surety business, and examine the amounts paid by them in losses since they began business, it will be found that the average aggregate losses as compared with premiums received was very close to 46%. While the method of computation of the premium reserve by the United Surety Company nowhere appears affirmatively in the record, it is reasonable to assume that it was calculated in accordance with the requirements of those States where such reserve is required by law to be maintained. This would accordingly represent on outstand-

ing policies annual premiums of $120,189.08. The difference appearing between experience tables and statutory enactments may possibly represent what is termed a margin of safety, but there are two factors in the present case which seem to require that this margin should be somewhat larger than would be requisite under normal conditions. These are, first, that after this lapse of time since the appointment of receivers, the risks which have not been reinsured are those of a more hazardous class than the general average of risks written by such companies; and, second, that approximately $750,000 of the bonds issued run to the Government of the United States, as against which in the event of a default hereafter ascertained, no period of limitation could be interposed as a bar. These two factors seem to make it both proper and equitable that the sum to be held as a reserve for the protection of potential creditors (the creditors of the third class as hereinbefore enumerated) be a larger sum than the 46% or 50% of the annual premiums. Just what this ought to be there is no precise way of determining, and the designation must inevitably be an arbitrary one. If the receivers had just been appointed it might be proper to reserve a sum equal to the entire amount of the annual premiums, but in view of the lapse of two years since any new obligations have been assumed, by or for the company, and the further fact that the potential liabilities have been reduced during that period from $70,000,000 to $9,751,250.48, it would seem that a reserve in the nature of a premium reserve of 60% of the amount of the annual premiums, or $72,113.45, is a proper and reasonable reserve to be retained in the hands of the receivers at this time for the protection of potential creditors.

With regard to creditors of the second class it appears that at the time the receivers took charge there was a claim reserve for the benefit of such creditors of $267,832.83; and that that reserve had been increased at the end of the calendar year to $481,254.01, when it is designated as a loss reserve. In this form this constitutes a fund alike applicable

to creditors of both first and second classes, and there is nothing whatever in this record to show the relative amounts of liquidated and unliquidated liabilities. That in the time that has elapsed since the appointment of receivers a large proportion of the losses, unliquidated at the time of their appointment, should now have become liquidated would seem a reasonable conclusion, but inasmuch as all of the losses for defaults which have taken place are in all probability not yet liquidated, it is but equitable that there should be a reserve for creditors of this class. Reserves of this character are less covered by statutes than are those of the kind known as premium reserves, nor is it by any means certain that different companies follow the same rule in the creation and maintenance of such claim or loss reserves. It is therefore impossible for this Court with the meager knowledge to be derived from the record to say what, at this time, would constitute a proper reserve to be retained by the receivers wherewith to meet in some future account the claims at present unliquidated; that can only be equitably determined upon a knowledge of the aggregate of the unliquidated claims, together with some information from the receivers respecting them, taken in connection with the aggregate of the liquidated claims. All that this Court can do at this time is to reverse the order which was appealed from, and remand the cause to the Circuit Court of Baltimore City, to the end that the receivers may reduce to their possession in cash the assets and choses in action in their hands as receivers, so that the case may be referred to an auditor for the statement of an account, in which after reserving the sum of $72,113.45 for the benefit of the potential creditors of the United Surety Company, and such further reservation as may to the Court seem proper for the protection of creditors of the company having unliquidated claims, the balance may be audited to and distributed among creditors whose claims and the amounts thereof are fully established.

There remains at the present stage of these proceedings but one other matter for consideration. The assets in the

hands of the receivers as shown by the latest estimate of the receivers contained in the record, amount to $587,931.00; in addition to which there is deposited with the State Treasurer for the protection of policy holders, Baltimore City stock of the par value of $200,000.00, and a present market value of about $180,000.00; showing as the total amount available to meet both present and future liabilities $767,-931.00. A schedule of the potential liabilities is likewise in the record, but no statement showing, either by items or in the aggregate, the amount of the claims of policy holders liquidated or unliquidated.

If then from the assets in the receivers' hands of $587,-931.00 (not taking into consideration for the present the deposit with the State Treasurer) there be deducted the sum of $72,113.45 already ascertained as a proper reserve to meet future probable claims arising from present potential liabilities, there will still remain in the hands of the receivers more than half a million of dollars with which to pay the losses and claims against the company, and this may be entirely adequate for that purpose. If on the other hand, when the assets shall have been converted into cash the sum realized shall prove insufficient, it may be that some portion of the City stock deposited with the State Treasurer should be directed to be sold, and the proceeds thereof applied to the claims of policy holders, but these are questions which can only be determined upon more complete information than is contained in the record before us.

> *Order reversed and cause remanded for further proceedings, costs of the appeal to be paid out of the funds in the hands of the receivers.*