MUNICH RE-INSURANCE COMPANY

*vs.*

UNITED SURETY COMPANY,

AND

RECEIVERS OF THE UNITED SURETY COMPANY

*vs.*

MUNICH RE-INSURANCE COMPANY.

*Surety companies: re-insurance agreements; accounting; con-
struction.*

In a re-insurance agreement between two surety companies,
a certain kind of business was excluded from a general account-
ing between the parties; when proceedings were had to termi-
nate the contract, there was an agreement as to the apportion-
ment of overhead charges, executive costs, etc.; in the absence
of any other evidence or method of apportionment, it was *held,*
that an apportionment of such charges according to the volume
of the business excluded, although probably liberal, could not be
held to be erroneous.                                    p. 487

Two surety companies had entered into a re-insurance agree-
ment, but owing to litigation between them no settlement had
ever been had under the contract; in proceedings for an account-

ing between them, it was *held,* that in construing their mutual obligations, the accounting should include the ascertainment of the annual profits and losses required to be made during the currency of the contract, and also the final settlement for which the contract provided, after a notice of withdrawal should be given.                                                                      p. 488

The agreement of the parties was that both the premium "reserve for unexpired risks at the end of the previous year" and the "reserve for unadjusted claims" at the end of the previous year, should be charged as disbursements in accounting for the five-year period antecedent to any notice of termination, and that the profits and losses so determined should be in the proportion and manner provided in the contract; *held,* that such being the effect of the contract and the direction being positive as to the immediate payment of the annual balance so ascertained, interest was to be allowed on those sums from the time they were respectively due.                                            p. 494

In the re-insurance agreement it was provided that one of the companies should receive as "reimbursement for good will" 5% of its share of the net premiums for the five years previous to the termination of the contract; the fact that that company instituted legal proceedings which ended in the termination of the contract did not prevent it from being allowed the 5% commissions so provided for.                                    pp. 495-496

*Decided June 26th, 1913.*

The facts are stated in the opinion of the Court.

Cross-appeals from the Circuit Court of Baltimore City (Bond, J.).

The two appeals were argued together before Boyd. C. J., Burke, Pattison, Urner, Stockbridge and Constable, JJ.

*Edgar H. Gans* and *R. E. Lee Marshall* (with whom was *Arthur Geo. Brown* on the brief), for the Munich Re-Insurance Company.

*Joseph C. France* and *Stuart S. Janney* (with whom were *Albert C. Ritchie* and *Robertson Griswold* on the brief), for the receivers of the United Surety Company.

URNER, J., delivered the opinion of the Court.

An agreement executed in the early part of 1906 between the Munich Re-Insurance Company and the United Surety Company, contained the following clauses upon whose construction the questions raised by this appeal depend:

"Article I.   The 'United' agrees to cede to the 'Munich,' and the 'Munich' agrees to accept, a one-third ($\frac{1}{3}$) share of the amount insured or renewed under every bond, policy or guarantee which shall be issued by the 'United' in the territory of the United States, for indemnification against loss under the three classes of insurance known as Surety, Fidelity and Burglary Insurance."

"Should the 'United' decide at any time during the currency of this agreement to carry on any casualty or other business, it is agreed that the 'United' will offer to the 'Munich' a participation in such business under the terms of this agreement, and the 'Munich' has the right to accept or refuse the participation in such business."

"Should the 'Munich' elect not to participate in such business, the income and proper charges connected with that business shall not be an item of the account with the 'Munich'."

"Article V.   The 'United' shall charge the 'Munich,' and the 'Munich' shall be liable for the original commissions and brokerage paid by the 'United,' * * * and the 'Munich' further agrees that it shall be charged with one-third ($\frac{1}{3}$) of all management and office expenses connected with the business included under this contract," such expenses to "embrace a *pro rata* charge of a rental of ten thousand dollars ($10,000.00) per annum for the office of the 'United'."

"Article VIII. The 'United' will render to the 'Munich' within two months after the close of each year a detailed account, and such accounts shall include all income and disbursements in accordance with the books of the 'United,' and shall be specific on the following items:

"Income:—1. Gross premiums. 2. Reserve for unadjusted claims at the end of the previous year. 3. Reserve for unexpired risks at the end of the previous year. 4. Interest received, excluding 4½% interest on the Capital Stock.

"Disbursements:—1. Return premiums and rebates. 2. Re-insurance premium. 3. Claims paid, less salvage and re-insurance in other companies. 4. Commissions and brokerage allowed. 5. Salaries, fees and all other charges of officers, clerks, agents and other employees. 6. Taxes, license and insurance department fees. 7. Rental of offices and all other disbursements, itemized as follows: (a) Advertising. (b) Printing and stationery. (c) Legal expenses. (d) Miscellaneous expenses. 8. Premium reserve for unexpired risks. 9. Reserve for claims. The above shall only include expenses incident to the Surety, Fidelity and Burglary Insurance business."

"Article IX. If the account provided for in the preceding article shows a profit, the 'Munich' shall receive one-third (⅓) thereof as its share under the terms of this agreement. If the said account shall show a loss, the 'Munich' will pay one-third (⅓) of said loss to the 'United'."

"The account shall be examined within one month after its receipt, and any balance due by either party shall be paid immediately upon receipt of confirmation by New York draft, or its equivalent."

"Article XII. This agreement shall take effect as of the second (2nd) day of January, 1906, and shall continue for a period of five (5) years from said date, and shall be tacitly renewed for further periods of five (5) years thereafter, unless written notice of a desire

to terminate same be given by registered letter from either party one year previous to the expiration of any term of five (5) years * * * The 'Munich' continuing to participate in all insurance coming within the terms of this agreement, granted or renewed by the 'United' during the currency of any notice of cancelment, and remaining liable for its share of the claims arising out of such insurance and out of insurance in force at the time of the notice being given until expiration of the liability thereon."

"Article XIII. It is especially agreed that in case notice of termination is given by either party under this agreement, the 'Munich' shall receive as reimbursement for good-will five per cent. (5%) of its share of the net premiums, *i. e.,* premiums less cancelments, of the last five years previous to the expiration of the notice of termination of this agreement."

"In case of notice of termination by either party, the accounts shall be made up not later than two years after the expiration of the notice. Such account shall not be charged with any premium reserve. If claims are still outstanding, the proper reserve shall be charged, and after the final settlement of each of such claims, the 'Munich' will be paid any difference in its favor, and pay any difference in favor of the 'United'."

The contract from which these clauses are quoted was sustained in 113 Md. 200 as against the effort of the Munich Company to have it annulled upon the theory that its execution by that company had been induced by fraudulent misrepresentations. It was found to be unnecessary to pass upon the question of fraud for the reason that the Munich Company was shown by the evidence to have waived the right of rescission it was then asserting. The decree from which the former appeal was taken dismissed the bill of complaint filed by the Munich Company and provided for an accounting under the agreement as prayed by way of cross-relief in the United Company's answer. Upon the affirmance of this

decree the cause was remanded for the further proceedings contemplated. In order to facilitate the accounting thus directed the parties entered into an agreement on November 19, 1910, by which they appointed the American Audit Company their agent "to examine the records, books and accounts of the United Surety Company, and therefrom to state an account in annual periods beginning 2nd January, 1906, and ending on January 1st, 1911, applying to the share of the Munich Re-Insurance Company in the business of the United Surety Company" under the contract in question. The agreement authorized the appointment of one delegate for each of the companies to assist in the accounting. It was provided that all amounts passed by the Audit Company, and to which no objection was raised by either of the delegates, should be deemed to be accepted, by both parties. It was agreed, however, that the audit should not extend to outstanding liabilities for unexpired risks or claims not yet settled, which were reserved for future adjustment under the terms of the contract. The Audit Company's report, which was to include a separate statement of the items in respect to which a difference of opinion might arise between the Munich and United Companies, was to be adopted as the basis of the accounting under the decree.

The preliminary investigation for which the parties thus made provision was completed in December, 1911. In the report then submitted the Audit Company stated that as the agreement by which it was appointed provided for a statement of the results of the examination in yearly periods it had taken no notice of the question of good-will mentioned in Article XIII of the participation contract, and that no reference was made in the report to Premium Reserves and Reserves for Claims because the agreement under which the auditing was done expressly left these items open for further adjustment. The delegates, Mr. Stuart S. Janney for the United, and Mr. Gustave A. Zieman for the Munich, agreed as to all items covered by the Audit Company's accounting except those relating to a class of business conducted by the

United Company, known as "Excise Business," involving
the execution by it as surety of bonds given to the State of
New York by licensed liquor dealers as indemnity against
the violation of any of the laws regulating the sale of in-
toxicating liquors.    The question between the delegates in
the first instance was whether this business was included in
the classes of insurance specified in the agreement.    After
some discussion, however, they instructed the Audit Com-
pany to eliminate the items relating to the excise business.
These items embraced the receipts of income from that source
and a comparatively small amount of expenses which could
be identified as having been incurred in that particular con-
nection.    They did not include any part of the office and
management expenses, commonly known as "overhead
charges," attributable to the prosecution of the United Com-
pany's business as a whole.    The Munich Company insisted
that as the excise business proceeds were to be deducted from
the income, with which the United Company was to be
charged in the accounting, there should be excluded from the
disbursements, for which it was to be credited, a proportion
of the overhead charges in the ratio which the excise income
bore to the entire volume of the company's premium receipts.
This claim was resisted by the United Company on the
ground that such a deduction from the disbursements would
be in excess of the expenses for which the excise business was
actually responsible.    It was the understanding of Mr. Zie-
man that the exclusion of the excise proceeds was made dis-
tinctly subject to an allowance for overhead charges, while
on the other hand Mr. Janney understood that the elimina-
tion of the ascertainable excise items was agreed upon uncon-
ditionally and that the question of overhead charges was left
open for future determination.    In view of the inability of
the delegates to agree upon this point the Audit Company
prepared two sets of accounts, one including and the other
excluding excise business.    The report stated that it was im-
possible from the books of the United Company to separate

the overhead charges as to the different classes of business conducted, and for that reason statements were made out showing the totals of such charges for each year with a memorandum added as to the net amount of the three classes of business, viz: 1. Fidelity, Surety and Burglary; 2. New York Excise; 3. Casualty.

After the Audit Company had thus reported the parties proceeded with the accounting before the auditor, to whom the decree had referred the case for that purpose. The questions then open and in controversy were: 1. The one already stated in reference to the excise business. 2. Whether premium reserves for unexpired risks and reserves for claims should be included or excluded as disbursements, and if included, whether interest was chargeable upon the Munich Company's share of the apparent losses which the use of those items produced. 3. Whether an allowance should be made the Munich Company for good-will under Article XIII of the contract. The auditor's report disposed of these questions as follows: 1. The excise business was excluded and a *pro rata* deduction was made for overhead charges. 2. The premium reserve for unexpired risks and the reserves for claims were included as disbursements, and interest was charged on the yearly balances. 3. No allowance was made to the Munich Company for good-will. Exceptions were filed by the Munich Company to the action of the auditor in reference to the 2nd and 3rd points indicated, and the United Company excepted as to the disposition of the question first noted. The Court below overruled all the exceptions and ratified the audit, and both parties have appealed.

The issue raised as to the deductions on account of the excise branch of the business under investigation can give us no difficulty. While the nature of the liabilities incurred by the United Company in that connection would seem to place these undertakings in the category of surety business and therefore within the participation contract, yet, as clearly shown by the testimony taken before the auditor, the parties expressly agreed that the excise items of receipts and ex-

penses should be excluded from the accounting, the only dis-
agreement being in reference to the question whether the
expense to be so deducted should include a proportionate part
of the overhead charges. It is evident from the record that
there is no available basis upon which the disbursements
properly chargeable to the excise business can be estimated
with any degree of accuracy. This subdivision of the Surety
Company's activities undoubtedly had the benefit of the
organization maintained for the promotion of its various cor-
porate enterprises, but the books furnish no means of segre-
gating the portion of the general management disbursements
attributable to any particular department. The evidence
tends to show that the excise business did not require the
attention of the executive and office force to the same extent
as the other lines of insurance in which the company was
interested, and an apportionment of overhead charges accord-
ing to the volume of the excluded business would appear to
be liberal. It is, however, according to the testimony in the
record, the only method by which a proper allowance for these
expenses can be approximated under existing conditions. In
our judgment the Court below correctly disposed of this ex-
ception.

The question as to the extent to which the premium and
claim reserves should be considered in the accounting re-
quires a reference to the relations of the contracting com-
panies to each other at the time of the preparation of the
audit. So far as the annual accounts mentioned in Article
VIII of the participation agreement are concerned it is dis-
tinctly provided that both classes of reserves shall be in-
cluded. But there is an equally express provision in Article
XIII that if notice of termination is given by either party,
the account to be stated after the expiration of the notice
shall not be charged with any premium reserve. The privi-
lege of withdrawal was secured to the parties by Article XII,
as above quoted, and was exercised by the Munich Company
in the manner prescribed, with the result that the contract
ceased to be operative, except as to business already subject

to its terms, when the original five year period expired on January 2nd, 1911.   The auditor's account was prepared in December, 1912, nearly two years after the withdrawal of the Munich Company from the agreement.   In consequence of the litigation between the parties no settlement ever occurred as to any part of the business. to which the contract applied.   The present accounting must accordingly include the annual ascertainments of profit and loss required to be made during the currency of the contract and also the settlement for which it provides after the expiration of the notice of withdrawal.   The audit as filed is composed of five annual statements in each of which both premium and claim reserves are charged as disbursements.   The statement for the final year of the contract will illustrate the method and theory of the accounting for all of the annual periods.   It is as follows:

DISBURSEMENTS.

1. Return premiums and rebates............$102,552.66
2. Re-insurance  premiums..................   20,537.74
3. Claims paid, less salvage, and re-insurance
       in other companies.................. 213,809.28
4. Commission and brokerage allowed........   86,726.52
5. Salaries, fees and all other charges of offi-
       cers, clerks, agents and other employees.   71,069.86
6. Taxes, licenses and Insurance Department
       fees. . . ...........................   27,059.48
7. Rental of offices...............$13,106.35
   And all other disbursements item-
     ized as follows:
           (a) Advertising expense....  7,442.74
           (b) Printing and Stationery.  2,433.50
           (c) Legal Expense..........  9,599.64
           (d) Miscellaneous Expense.. 42,207.18
                                      ─────────
                                                  74,789.41
8. Premium reserve for unexpired risks....... 185,698.88
9. Reserve for claims........................ 242,420.34
                                      ─────────
        Total Disbursements..............$1,024,664.17
        Less Excise overhead charges......   22,379.48
                                      ─────────
        Total Disbursements charged against
           the Munich Contract............$1,002,284.69

### INCOME.

1. Gross premiums...........................$454,844.42
2. Reserve for unadjusted claims at the end of
      the previous year.....................  66,063.23
3. Reserve for unexpired risks at the end of the
      previous year......................... 254,951.96
4. Interest received, excluding 4½% interest
      on capital stock.....................  10,478.72
   By excess Disbursements over Income, con-
      tra. . .  ............................ 215,946.36

                                           ─────────────
                                            $1,002,284.69

The excess of the disbursements over the income is treated by the auditor as a loss, of which one-third is charged to the Munich Company with interest. In each of the preceding annual accounts, except the one for 1908, a loss was similarly ascertained and charged. For the entire period the amounts found to be owing by the Munich Company, after crediting $3,117.12 as its share of the profits for 1908, aggregated $154,338.28 including interest to April 1, 1911.

It is explained by the testimony that the premium reserves for unexpired risks represent a proportion of the annual premiums set apart as unearned until the expiration of the year for which they are paid in advance. At the end of the term for which the premiums are received the reserve is released and becomes available as current income. A new reserve is then created out of the premiums paid for the succeeding period. In the annual accounting for which the agreement provided the gross premiums were to be included in the income, and the proper deduction of the unearned portion was to be accomplished by charging premium reserves among the disbursements. The next accounting, however, would give the parties the benefit of the fund thus reserved by treating it as income under the description of "Reserve for Unexpired Risks at the end of the previous year." The same disposition was to be made with respect to the reserve

for claims, which, as the designation suggests, was composed
of amounts estimated for actual but unsettled losses. This
reserve was intended to meet a real though unascertained
liability to which both parties to the contract were subject in
the proportions specified, while the premium reserve had no
such purpose, but was provided merely as a suspension to that
extent of the right of the Surety Company to use the prem-
iums as ordinary income until the expiration of the full period
for which they were received.

In charging the reserves of both classes as disbursements
in the annual accounts for the four years prior to the notice
of withdrawal the audit is in conformity with the express
provisions of Article VIII to that effect. But in the account-
ing for the business of the last year under the contract we
think the terms of Article XIII are clearly applicable. The
notice of withdrawal to which that article refers having been
duly given, it is directed that the account be made up not
later than two years after the contract has been thus ter-
minated and that no premium reserve be charged. If the
previous accounting contemplated by the agreement had been
effected by the parties, the only business left open for ad-
justment when the contract expired would have been that
which pertained to the final year. It could not have been
intended that as to this period there should be *two* accounts,
one prepared under Article VIII including premium reserves
as disbursements, and a later one under Article XIII from
which such a charge should be excluded. The primary pur-
pose of the annual statements was to show the profits or losses
which the parties were to share. While the contract was in
current operation there was no prejudice to either party in
charging the premium reserves as disbursements for the rea-
son that these items would be credited as income in the ac-
count for the succeeding period. But when the agreement is
no longer in effect and the accounting deals with the last year
to which it can apply, the conditions are altogether different.
The premium reserve could not in such a situation be used as

a factor in determining the actual profit or loss upon which the settlement for that year depends because such a reserve as provided under this agreement, represents in fact neither a liability not an expenditure. It was manifestly upon this theory that the contract excluded the premium reserve from the accounting to be stated after its expiration, and in order that credit might not be given for premiums which were not fully earned it provided for an extension of the time for the accounting until this item could properly be treated as income. In our judgment, the audit, which, as previously noted, was filed near the close of the two year period allowed for making up the account of the business for the last year, and at a time when the premiums received for that year were fully earned, should not have charged as disbursements the premium reserve estimated as of January 1, 1911, and the exception which questioned the propriety of such a charge should have been sustained.

The decree overruling the exceptions and ratifying the audit recited that of the $154,338.28 found to be payable by the Munich Company $11,631.88 was a final indebtedness, and $142,706.40 was due to the United Company subject to a further accounting, and it was provided that the latter sum, with interest from April 1, 1911, be paid by the Munich Company to trustees named in the decree to be held and administered under the jurisdiction of the Court in accordance with the intent and meaning of the agreement between the two companies. It does not seem to us that this disposition of the case gives effect to the real purpose of the contract. The amount shown by the audit to be due by the Munich Company on account of the business of the fifth year was $71,982.13. The total of $154,338.28 was produced by adding to the result of the accounting for the last year of the contract period the amounts found to be due for the four preceding years. According to the plain terms of the agreement the Munich Company's shares of the losses shown by the annual accounts were *debts* which it owed absolutely and

which it was obligated to pay immediately. The explicit provisions on this subject would appear to preclude the theory that there should be any further accounting as to the indebtedness thus determinted. It is only with reference to amounts reserved for outstanding claims in the final account that the agreement provides for a further adjustment after the precise amounts required for the claims have been ascertained by actual settlement. The last in the series of the annual statements, as filed by the auditor, charges $185,-698.88 as premium reserve, and $242,420.34 as reserve for claims. The sum of these two items is $428,119.22, and one-third of this is $142,706.40, which is the exact amount directed by the decree of ratification to be paid to trustees with a view to subsequent accounting. The fund thus proposed to be created was largely in excess of the Munich Company's share of the losses for the last year, as shown by the account, and it was therefore ordered to be reserved out of the total indebtedness of that company ascertained for the whole period. As a result the Munich Company was placed in the position of owing only $11,631.88 as a "final indebtedness" to the United Company, although according to the annual accounts its liability for losses was definitely fixed at $30,-939.35 for 1906, $22,158.99 for 1907, $19,774.14 for 1909, and $71,982.13 for 1910, as against which it was entitled to a credit of only $3,117.12 for profits found to have been earned in 1908. By the terms of the contract the Munich Company's shares of losses or profits were payable promptly upon their annual ascertainment, and if they had been so paid, it is clear that there would have been no occasion to reopen the accounts thus settled, except as to the claim reserves for the final year under the special provision for that purpose.

The United Company is entitled unconditionally to the amounts found to be due it for the four years prior to the notice of withdrawal, as evidently intended by Articles VIII and IX of the contract, and the results thus determined are

not dependent upon the accounting for the last year of the business, which is placed upon a separate and distinct basis by the provisions of Article XIII. From the account for this final period the item of $185,698.88 as a premium reserve for unexpired risks should be eliminated. The trust created by the decree passed by the Court below would eventually accomplish this object, but we see no reason to require the Munich Company to pay out, even for a limited period, a proportionate part of the large sum just mentioned, when it is certain that the premiums for which the reserve was originally provided have long since become ful.y earned. The charge for claim reserves should be retained in the accounting, as contemplated by Article XIII. With the premium reserve excluded from the disbursements the account for the fifth year would show a loss of $30,247 48   One-third of this amount will be payable by the Munich Company to the receivers of the United Company as an ascertained liability, the parties remaining accountable with respect to outstanding claims as provided by the agreement.

The question raised by the exceptions as to the allowance of interest must be decided in the light of the provisions of Articles VIII. and IX. of the contract, to the effect that an account should be rendered by the United Company within two months after the close of each year showing the income and disbursements as specified, that the account should be examined by the Munich Company within one month after its receipt, that the Munich Company should receive one-third of the profits or pay one-third of the losses thus shown, and that the amount due by either party should be "paid immediately upon receipt of confirmation by New York draft, or its equivalent." Inasmuch as the time thus allowed for the submission and examination of the account might extend over three months subsequent to the close of the respective annual periods, the audit correctly treated the indebtedness for each year as being due and payable on the first day of the following April. It was contended that no

interest should be charged because the reserves which entered into the account as disbursements were not proper factors in the calculation of the *actual* profit or loss for any given year, and that but for the use of these items the apparent losses upon which' the indebtedness of the Munich Company is based would not have been indicated.   The difficulty in the way of our acceptance of this theory is the definite agreement of the parties that both classes of reserves should be charged as disbursements in the accounting for the period antecedent to the notice of termination, and that the profits or losses *thus* determined should be paid in the proportions and manner prescribed.   This being the plain effect of the contract, and the direction being positive as to the *immediate* payment of the annual balances ascertained by this method of accounting, we think interest is properly allowable on these amounts from the time they were respectively due.

The Munich Company claims the benefit of the provision in Article XIII. that in case of a withdrawal notice being given, that company should receive as "reimbursement for good-will" five per cent. of its share of the net premiums for the five years previous to the termination of the contract. This credit was disallowed in the audit on the ground that the course pursued by the Munich Company in attempting to rescind the contract and prosecuting a suit for its annulment, which continued during almost the entire period of its operation, had the effect of retarding instead of promoting the development of the good-will of the business to which the agreement related.   It is to be observed that the only duties imposed by the contract upon the Munich Company were to meet its proportionate liabilities on the classes of insurance designated and to pay a corresponding share of the losses.   It is being held to the full measure of these obligations in the present accounting.   The record is by no means conclusive in showing that the exercise by the Munich Company of its legal right to question the validity of the contract so materially prejudiced the United Company's interests as to justify the Court in obliterating one of the

provisions upon which the two companies definitely agreed. It was in 1906 that the effort to rescind the agreement was begun, and yet the gross premiums of $123,177.90 received for that year from the designated classes of insurance increased to $262,256.74 for 1907, $423,453.97 for 1908, $626,996.71 for 1909 and $454,844.42 for 1910. During these years, which covered the whole of the United Company's active career, the Munich Company was being charged with one-third of the management and office expenses incurred by the former company in the prosecution of its general enterprise. The five per cent. provided by Article XIII. is characterized as a "reimbursement" to be received by the Munich Company, and it was therefore plainly intended as a repayment in part of the disbursements with which that company was charged and which were regarded as contributing to the establishment of the United Company's business and goodwill during the early and relatively expensive period of its existence. This provision of the contract is emphasized by its declaration that the parties had "especially agreed" upon the five per cent. reimbursement to which it referred. The conditions presented by the record are not, in our view, of such a character as to justify an adjudication that this formal, positive and unqualified stipulation has become inoperative, while the remaining provisions of the contract are enforceable. It is our conclusion, therefore, that the Munich Company should be credited with five per cent. of its share (one-third) of the net premiums received from the specified classes of business during the period of the agreement. This credit will amount, according to the exhibits accompanying the audit to $25,094.47. The total amount correctly shown by the audit to be owing by the Munich Company as of April 1, 1910, including interest to that date, is $77,983.79. To this the audit added $4,372.36 as interest to April 1, 1911. The indebtedness we have found to be chargeable against the Munich Company in the account for the final year is one-third of $30,247.48, or $10,082.49. The aggregate of these debit items is $92,438.64. Upon this indebtedness the

five per cent. allowance should be credited as of April 1, 1911, and interest should be calculated and charged on the remainder to the date of payment. The amount thus ascertained will be payable to the receivers of the United Surety Company, as we find no necessity to direct its administration by separate fiduciaries.

The accounting in this case does not affect the ultimate liability of the Munich Company with respect to obligations issued by the United Company and covered by the participation agreement, as to which defaults are not now, but may be hereafter, disclosed. For the protection of potential claims of this nature, as between the United Company and the holders of its bonds and policies, provision has been made in the form of a premium reserve directed in the proceeding reviewed by this Court in *United States* v. *Poe et al., Receivers of the United Surety Company,* 120 Md. 89. The premium reserve there provided, and whose function is clearly and thoroughly discussed in the opinion by JUDGE STOCKBRIDGE, rests upon a different basis from the bookkeeping charge bearing that designation which is stipulated in the contract with the Munich Company as one of the factors in the annual ascertainment of its share of the losses or profits. This item is excluded from the accounting as to the last year of the agreement because there is an express provision to that effect in recognition of the fact that such a reserve is not justly pertinent to the determination of the actual results of the business and of the amount properly payable by one contracting party to the other for the final period. The Munich Company, however, is concededly responsible for its due proportion of all losses which may eventually develop from the insurance covered by the agreement.

> *Decree affirmed in part and reversed in part and cause remanded, to the end that the audit may be re-stated in accordance with this opinion, the costs of the cross-appeals to be paid equally by the parties.*