GUSTAV A. SCHLENS

*vs.*

EDWIN W. POE ET AL., RECEIVERS.

———

THE UNITED SURETY COMPANY ET AL.

*vs.*

GUSTAV A. SCHLENS.

*Contracts: by corporations; entered into by resolution; board of directors; construction of——. Equity: set-off.*

A contract within the scope of their authority may be entered into by a resolution of the board of directors of a corporation, and when properly adopted will bind the corporation.
                                                              p. 364

Such a resolution when adopted can not be modified by any mere memorandum attached to it.                    p. 364

When part of the assets of a corporation were sold to an officer by resolution of the directors, in proper form, no set-off can be claimed against the assignee of such officer, for value received, for traveling expenses, attorneys' fees and other expenses caused the corporation by such officer.          p. 376

Courts, in the construction of contracts, look to the language employed, the subject-matter and the surrounding circumstances; they are never shut out from the same light which the parties enjoyed when the contract was executed.   pp. 373-374

For a set-off to be allowed, in equity as well as at law, there must be a mutuality in the demands and the amounts must be liquidated and certain; and, in respect to mutual credits, in equity no more than in law, can set-off be allowed for uncertain damages or for torts. p. 375

*Decided April 7th, 1916.*

Cross-appeals in one record from the Circuit Court of Baltimore. (HEUISLER, J.)

The facts are stated in the opinion of the Court.

The causes were argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*J. Kemp Bartlett* (with whom was *Stuart S. Janney* on the brief), for Edwin W. Poe *et al.*, receivers.

*Alfred S. Niles* and *Morris Wolf* (of the Philadelphia Bar) (with a brief by *Niles, Wolff, Barton & Morrow*), for Gustav A. Schlens.

BURKE, J., delivered the opinion of the Court.

When the conceded and uncontradicted facts are extracted from the mass of testimony contained in the record before us, the questions before the Court present little difficulty. An outline of these facts will show the precise issues raised by the pleadings and indicate the principles of law which must be applied to the case.

The United Surety Company was incorporated by Chapter 479 of the laws of 1902, and organized and began business

about January, 1905. It was authorized by its charter to sell surety and casualty bonds in the State of Maryland and elsewhere. It extended its business to the States of New York, Massachusetts, and other States, in each of which it had perfected an organization and was doing quite a considerable amount of business. On April 10, 1906, a contract was entered into between the United Surety Company and the Munich Re-Insurance Company. The nature and terms of this contract were considered by this Court and the responsibility of the Munich Company under that contract was determined and established in *Munich Re-Insurance Co.* v. *United Surety Co.,* 113 Md. 200 and 121 Md. 479. The business of the company was not profitable, and on January 13, 1911, the Circuit Court for Baltimore City upon a bill filed by Thomas H. Bowles and others against the United Surety Company, that Court placed the affairs of the company in the hands of receivers. The receivers qualified and have since administered their trust under the jurisdiction of that Court.

About the close of the year 1909 the Surety Company found itself in a precarious condition. The insurance commissioner of the State of Maryland refused to permit the company to include in its annual statement certain items as assets. At a special meeting of the executive committee of the company held on February 3, 1910: "The President of the company reported that, as stated at the last meeting of the Executive Committee, the statement of the company from an insurance point of view showed an impairment of capital to the extent of $39,000, unless the Munich Re-Insurance claim, advance on contracts and several other disputed items could be allowed in the statement as assets. He stated that he had been in daily conferences with the Insurance Commissioner for Maryland, with the representatives of the company at Washington, and before the Treasury Department there, making every effort possible to have these items allowed as assets, but that he had been unable to accomplish this, and that the Insurance Commissioner for

Maryland, as well as the Treasury Department at Washington, insisted that these items could not be allowed, and that therefore they would not be allowed by the Insurance Commissioners of other States in which the company did business, and that consequently the only statement of the company which the Insurance Commissioner could pass showed an impairment of $39,000; and that unless this could be made good the company's statement would be disallowed and the Insurance Commissioner stated that it could not continue to write further business.

He also stated that the Insurance Commissioner for Maryland had notified the company that this impairment must be made good by noon of February 4th, and that the commissioner also stated that in his judgment at least $75,000 in cash ought to be put up as a safe margin to make good this impairment and give a reasonable surplus.

The president further stated that after the passage of the resolution and the discussion of this matter at the last Executive Committee meeting, he, together with Mr. Ernest J. Knabe, Jr., the chairman of the board, and Mr. Hershey, as counsel, had been actively engaged in endeavoring to devise some means by which this money could be raised; that they had submitted the entire situation and all the facts, and statements, etc., to the insurance commissioner for Maryland, and at his suggestion and with his approval, they had put themselves in touch with several of the larger surety companies operating in the same line of business and acting through Mr. Edwin Warfield, the President of the Fidelity Trust and Deposit Company, with a view to securing assistance from those gentlemen to save the company from going by the board.

That they had submitted, with the approval of the insurance commissioner, and at his suggestion, a proposition through Mr. Warfield, to sell the claim of this company for amounts due or to become due under the Munich Re-Insurance contract, also amounts due on advances on contracts, amounting to approximately $47,282.57, also the so-called

"Salvage" account, amounting to approximately $39,211.00—
as well as premiums over ninety days old, amounting to
approximately $40,405.69, for the sum of $100,000.00, and
that Messrs. Ernest J. Knabe, Jr., and his brother William
Knabe, as majority stockholders of the company, in order to
assist the company, also offered to guarantee the said Fidelity
Trust and Safe Deposit Company, or any syndicate which
they might form to make such purchase, to make good any
loss that such purchaser might sustain from the purchase of
these non-admitted assets. He reported that after prolonged
negotiations and a number of conferences with these gentle-
men, they took the position that in the light of their expe-
rience as insurance people, these non-admitted assets were of
an extremely uncertain character, most of them being con-
tingent upon the outcome of law suits, and that they would
not consider even paying $50,000 for the same, or any other
price, nor would they purchase them or loan money on them
to any purchaser. The president stated that after all other
efforts had failed, he had succeeded in inducing the Messrs.
Ernest J. Knabe, Jr., and William Knabe to purchase these
non-admitted assets upon terms set forth in the following
resolution, which he now submitted for the action of the com-
mittee, to wit:

"Whereas, in order to save this company from fail-
ure and to enable it to preserve its extremely valuable
assets and to protect the interest of all the stockhold-
ers and policy holders, and to enable the company
to continue in business, it is necessary to raise imme-
diately a certain amount of cash; and

"Whereas, Messrs. Ernest J. Knabe, Jr., and Wil-
liam Knabe have offered to purchase all the assets here-
inbefore set forth for the sum of one hundred thou-
sand dollars, upon terms herein set forth; now, there-
fore, be it

"Resolved, That this company do sell for one hun-
dred thousand dollars, on the terms hereinafter men-
tioned, to Messrs. Ernest J. Knabe, Jr., and William
Knabe, absolutely, its claims for all premiums over

ninety days old, as per memo. submitted and to be
set forth in these minutes, the face value of which is
$40,405.69, but all of which are subject to agent's com-
missions and some of which are admittedly bad, and
the net value of which is estimated should be at least
$19,000, but whose amount is in no sense guaranteed;
all advances on contracts, the net value of which is es-
timated should be at least $30,000, but which amount
is in no sense guaranteed; and the so-called 'salvage'
account, the net value of which should be at least
$20,000, but whose amount is in no sense guaranteed;
and also the claim of this company known as the Mu-
nich Re-Insurance claim, now pending in the Court of
Appeals of Maryland, the net value of which is esti-
mated should be at least $88,000, but whose amount is
in no sense guaranteed; all of which assets are to be
sold as aforesaid, of which seventy-five thousand dol-
lars is to be paid in cash this day and the balance to
be paid within six months from the date hereof; the
deferred payment of $25,000 as aforesaid to be se-
cured by this company retaining title to the said Mu-
nich Re-Insurance claim, said claim to be assigned
finally and absolutely to the said Messrs. Knabe when
and as soon as said $25,000 is paid. If the same shall
not be paid until or before the final settlement is had
of said Munich Re-Insurance claim, then any balance
realized from said claim over and above $25,000 with
interest from this date, to be and become the prop-
erty of said Messrs. Knabe, subject, however, to the fol-
lowing conditions to which the said Messrs. Knabe
are to agree and do hereby agree:

"First—The United States Surety Company shall
agree and it does hereby agree that it will serve as the
agent of the said Messrs. Knabe to use their best ef-
forts and diligence to collect, subject to the general di-
rection and control of the said Messrs. Knabe, all of
the aforementioned assets hereby sold, and to pay the
net proceeds from such collections as collected to the
said Messrs. Knabe.

"Second—That if the amount realized from all of the said assets shall exceed the amount of the purchase price paid as aforesaid, plus 6 per cent. interest and 33 1/3 per cent. of the amount paid in addition as a bonus, then the amounts realized from said assets in excess therefor shall be returned to the company.

"Third—That no releases or settlements for less than the full amount of the claim shall be made, without the assent of the Messrs. Knabe or one of them being first had and obtained.

"Fourth—That any time upon the demand of the Messrs. Knabe or either of them, a statement shall be rendered as to the conditions of the said claims, or any other information or assistance with reference to the collection thereof which may be needed shall be furnished.

"Fifth—Notice shall be given to the said Messrs. Knabe when and as any payments are received on account of said claims, and immediate remittances thereof shall be made either to the Messrs. Knabe or to their order.

"Sixth—The cost and legal expenses, if any, in connection with the collection of any of these assets, shall be deducted from the proceeds of the claim collected, and shall not be borne by the Surety Company, but no counsel fees shall be incurred except with the assent of the said Messrs. Knabe or either of them.

"Seventh—That all provisions in this arrangement set forth as to any assignment by the Messrs. Knabe shall affect the Surety Company only in the event the said Messrs. Knabe notify them that they have assigned said claim, and the said assignees requesting that they be treated in the place of said Messrs. Knabe. Otherwise the Messrs. Knabe shall be recognized as the only parties in interest.

"Eighth—That the said Surety Company in this connection assumes no other obligations than to use its best efforts and to exercise due diligence and good faith in the collection of these accounts, and in the car-

rying out of the provisions of this resolution, and if in the judgment of the said Messrs. Knabe the proper methods of diligence should not be exercised in the collection of any particular asset, the said Messrs. Knabe, or their assigns, may revoke the agency for the collection of that particular item.

"In case of any dispute between the Surety Company and the Messrs. Knabe as to the amount for which any claim shall be settled, the Surety Company shall always have the option of repurchasing any given item at the price at which the other parties wish to settle or *vice versa.*

"Ninth—Inasmuch as the Surety Company has an interest in a possible surplus over and above the amounts as hereinabove stipulated, the Messrs. Knabe are also to agree that no settlement of any claim shall be made without first obtaining the assent of the Surety Company.

"Resolved also, That the officers of the company be authorized to execute any papers that may be found necessary to carry out the provisions of this resolution.

"This contract shall be binding on the successors and assigns, and the personal representatives of the parties hereto, provided that the Messrs. Knabe shall notify the company in writing of any assignment of their interests as herein created, and in such event, shall file with the company a recital of the privileges reserved to them hereunder, which are to be extended to such assignees.

"Resolved also, That this resolution be submitted to the Insurance Commissioner for Maryland, who is thoroughly informed as to this situation and as to the necessity of this action, and that before it becomes effective his approval thereof be obtained."

Attached to the resolution was a statement of the amounts advanced on contracts and of the sum that could probably be realized therefrom; also a statement of the salvage ac-

count, and a statement of the gross amount of uncollected premiums. This schedule was designated "as a statement of assets sold." Mr. Edwin J. Farber, the counsel of the company was present at the meeting, and approved of the action taken, and immediately after the passage of the resolution the Messrs. Knabe paid over to the company $75,000.00 on account of the purchase. Mr. James E. Green, the deputy Insurance Commissioner of Maryland, was present at the meeting and approved in writing the action taken "as in said minutes recited." The sum paid by the Knabes was borrowed by them from Wolfe Bros. & Company of Philadelphia, a banking firm, and, in addition to interest on the loan, they were charged a bonus of $25,000.00. This probably accounts for the insertion of the provision as to a bonus appearing in the second clause of the resolution. The Knabes were largely indebted to Wolfe Bros. & Company at the time this money was borrowed and on February 2, 1910, had agreed to assign to them the assets they were about to acquire from the United Company as security for that and any other indebtedness, present or future which they might owe them, and on February 3, 1910, immediately after the passage of the above resolution, they executed a written assignment to Wolfe Bros. & Company of "each and ever right, privilege, and interest granted to us and either of us, by the resolution of the Executive Committee of the Board of Directors of the United Surety Company, duly passed this date, and this date approved and accepted by us, as collateral security as per agreement of February 2, 1910." A copy of the resolution was attached to the assignment.

The following note was appended to the annual statement of the United Surety Company for the year 1909:

"In the above statement of assets and liabilities, the Insurance Department on December 31st, 1909, allowed temporarily the following assets to stand, viz: Advance on Contracts, $42,916.69; Open Re-Insurance Account, $88,962.83; for the reason that negotiations were then on foot for a sale of those two items,

which would realize a sufficient sum to furnish a sub-
stantial surplus, with said items eliminated. Such
sale has been effected, the sum of $75,000.00 has been
received in cash, and the resulting state of the account
shown in a supplemental statement hereto annexed
presenting the condition that would have existed on
December 31st had the payment of $75,000 been made
prior to that date."

The Knabes, since 1907, had held a majority of the stock
of the United Company, which had been fixed by its charter
at five thousand shares, and since that date had been the
dominating and controlling factors in the affairs of the com-
pany. On April 16, 1910, an agreement was entered into
between the Knabes and Thomas H. Bowles whereby, sub-
ject to certain provisions therein contained, they sold and
agreed to deliver to Mr. Bowles not less than 3,145 shares,
and if possible 3,500 shares of the capital stock of the United
Surety Company at the price of fifty-nine dollars per share.
The following provision, which throws much light upon one
of the questions in this case, is here transcribed:

"It is agreed that the sale to the said Knabe Broth-
ers of certain 'non-admitted assets' as per resolution
appearing on the minutes of the Executive Committee
of the United Surety Company shall remain in full
force and effect with the following exceptions, to wit:
the said Messrs. Knabe shall be relieved from the pay-
ment of the deferred payment of $25,000 therein pro-
vided for, and after the repayment to them of any
balance due on the $75,000 paid on account of the
purchase of said 'non-admitted asets,' with interest,
they shall be entitled to receive one-third (1/3) of
any amount that may be realized by the company out
of said 'non-admitted asets' over and above the origi-
nal $75,000 with interest up to $25,000 as their share;
the management and control of said assets to be in the
company exclusively."

As a part of this agreement the Knabes placed their resignations as directors of the United Company in the hands of Mr. O. F. Hershey and gave to Messrs. Janney and Hershey, jointly, an irrevocable proxy to vote the stock pending the transfer of the same to the name of Bowles or his assignee.

The stock was delivered to Mr. Bowles pursuant to the agreement, and on April 29, 1910, at a meeting of the Board of Directors of the United Surety Company the Messrs. Knabe resigned as directors and severed all official relation with the company. After their resignations had been accepted, the following resolution—and it is admitted to be the only one passed at that meeting—was proposed and adopted:

"Whereas, under and by virtue of a resolution of the Executive Committee passed February 3rd, 1910, as ratified and approved by the Insurance Commissioner of Maryland, certain so-called non-admitted assets of the company were sold to Messrs. E. J. Knabe, Jr., and William Knabe upon the terms and conditions in said resolution set forth; and

"Whereas, under the terms of said sale, as aforesaid, there is still due from said purchasers a deferred payment of twenty-five thousand dollars, and said purchasers are willing to consent to a modification of said contract of sale, as herein set forth, provided they are released from the payment of said deferred payment; and

"Whereas, it is believed to be greatly to the advantage of this company to modify said contract, as herein provided; now, therefore, be it

"Resolved, That the said Messrs. Knabe, their personal representatives and assigns, be and they are hereby relieved from the payment of said deferred sum of twenty-five thousand dollars, with interest, the conditions of said release and the modifications of said contract, to which Messrs. Knabe and their assigns have assented, and which assent is to be evidenced by such appropriate instruments as counsel of company may require, are as follows:

"First—The management and control of said assets shall be in this company exclusively, for the purpose of collecting same and making payments as herein and in said original resolution provided.

"Second—After the payment out of the first proceeds from the collections on all said 'non-admitted assets' of any balance of the seventy-five thousand dollars paid therefor, with interest, the company shall, out of all proceeds from said assets realized over and above such balance on seventy-five thousand dollars, with interest, pay one-third to the said Messrs. Knabe, their personal representatives and assigns, and two-thirds to the company. But such one-third going to the Messrs. Knabe shall not exceed twenty-five thousand dollars. All over and above that amount to go to the company also."

This meeting was held and the above resolution was passed for the purpose of giving effect to the agreement between the Knabes and Bowles above referred to. Mr. Ernest J. Knabe, Jr., explained to the board the reasons for calling the meeting, and stated that he had disposed of his entire holdings of stock to Mr. Bowles, and in resigning thanked the board for their co-operation. His resignation was accepted with regret, and a vote of thanks was tendered to him and his brother, William. It is apparent that whatever feeling had theretofore existed against Mr. Knabe by reason of certain acts mentioned in the evidence it was then entirely allayed— good relations had been established, and the company looked forward with hope to a profitable and successful future, which, however, as we have seen, was not realized. After the meeting had adjourned, and, without the knowledge of either of the Knabes, the following note, or memorandum was entered upon the minutes by the secretary under the supervision of Mr. Farber: It recited that before the resolution was passed it was discussed generally, and

"It was stated and understood that the title to the claim of the United Surety Company against the

Munich Re-Insurance Company still vested and should continue to vest in the United Surety Company, and assurances to the above effect were also given by Mr. Ernest J. Knabe, Jr., and their counsel, Mr. O. F. Hershey on behalf of Messrs. Knabe, who also stated upon questioning by Mr. Farber that the interest referred to in said resolution should only run against the assets and not against the company, and that if the assets should be insufficient to pay said claim of the Messrs. Knabe that their interest should cease to run."

This note, made without the knowledge, authority or consent of the Knabes, can not operate to alter or modify the legal effect of the resolution, although it was made the subject of a great deal of oral testimony as to what a number of the witnesses understood to be the meaning of the resolution.

About April 1, 1911, the loan from Wolfe Brothers & Company to the Knabes was paid. By the amended answer of the receivers filed in this case, September 15, 1915, it is stated that they hold in cash and United States Government Bonds realized from "Advances on Contracts," "Salvage Accounts" and "Premiums over Ninety Days Old"—three items which it is admitted passed to the Knabes under the resolutions mentioned—the sum of $11,106.87, and the receivers have received from the Munich Re-Insurance Company on the re-insurance contract referred to, the sum of $77,445.79.

On February 15, 1913, Gustav A. Schlens, claiming by assignment from Ernest J. Knabe, Jr., and William Knabe the non-admitted assets specified in and sold to them by the resolutions above mentioned, filed a petition in the receivership proceedings in which he claimed to be entitled to the proceeds of all said non-admitted assets. He prayed that an order be passed directing the receivers to answer the petition and show:

"First—What assets remain in their hands out of the original assets sold under the resolution of February 3rd, 1910, as modified by the resolution of April 29th, 1910;

"Second—What monies have been paid by them to your petitioner or his predecessors in title to said assets;

"Third—What monies are in their hands collected out of said assets and not paid to your petitioner or his predecessors in title to said assets.

"And your petitioner further prays that an order may be passed decreeing:

"First—That the receivers in this cause immediately pay to your petitioner any and all sums now in their hands collected or received by them out of the assets sold to Messrs. Knabe and now owned by your petitioner;

"Second—That all property and assets which were the subject of the resolution of the special meeting of the executive committee of the United Surety Company held on February 3rd, 1910, and of the resolution of the meeting of the board of directors of the United Surety Company held on April 29th, 1910, and now in the hands of the receivers appointed in this cause, are the property of your petitioner free and clear of any claims of stockholders or creditors of the United Surety Company, and are held by said receivers as agents for your petitioner, subject to the terms and conditions of the resolutions aforesaid;

"Third—That all monies coming into the hands of the receivers from the assets aforesaid be immediately paid to your petitioner as the same are received by the receivers, until the amount to which your petitioner is entitled under the resolutions aforesaid is fully paid and discharged."

He filed with the petition copies of the resolutions of February 3, 1910, and of April 29, 1910, and a copy of the certificate of the deputy insurance commissioner approving

the minutes of February 3, 1910. On February 28, 1915, the receivers—Edwin W. Poe, Stuart S. Janney and Ernest J. Clark—answered the petition. They admitted that the copy of the resolution of February 3, 1910, filed with the petition was correct but they did not admit the legal effect claimed for it; they admitted that the non-admitted assets mentioned in the copy were the assets referred to in the resolution of the Executive Committee of the United Surety Company according to the books of the company, and they admitted the passage of the resolution of April 29, 1910, as stated in the petition; they stated, "that there was attached to the original paper covering the said transaction a list of premiums over ninety days old, a copy of which is hereto attached marked Receivers' Exhibit No. 1. It also appears that all of the above-mentioned premiums, together with certain other and additional premiums, were after the date of said resolution transferred to a different account on the books of the United Surety Company, labeled "E. J. Knabe, Account," and thereon were entered a list of premiums at that time over ninety days old, a copy of which is attached marked Receivers' Exhibit No. 2, and these receivers do not know which is the correct list, showing the assets actually assigned or held in trust in pursuance to said resolution." They stated their belief that the action of the Executive Committee of February 3, 1910, had been approved by the Insurance Commissioner of Maryland and that the records of the Surety Company showed that at the time of the passage of the resolution of that date the Knabes paid $75,000, "and at the time of the said payment, notice of the assignment of the rights of said Messrs. Knabe in the assets referred to in said resolution to Messrs. Wolfe Bros. & Company, was served on the United Surety Company, a copy of which said notice is hereby attached, marked 'Receiver's Exhibit No. 3.' " As this assignment is of importance it is here quoted:

"Baltimore, Md., Feb. 3rd, 1910.
"United Surety Company:

"Kindly take notice that Messrs. Ernest J. Knabe, Jr., and William Knabe have this date sold, assigned, transferred and set over to us, their and each of their each and every right, privilege and interest granted to them by the resolution of the Executive Committee of the Board of Directors of the United Surety Company duly passed this date, and this date approved and accepted by them as collateral security as per agreement of February 2nd, 1910.

"Please remit all sums collected to us at N. E. Corner, 13th and Walnut Streets, Philadelphia, Pa., and give simultaneous notice of such remittances to Messrs. Knabe.

"Yours truly,
        "Wolfe Bros. & Company,
                "By Morris Wolfe,
"Receipt acknowledged:                    Attorney-in-Fact.
"United Surety Company,
        "Henry C. Penniman, President."

The answer stated that they were unable to discover any assignment from the Knabes to Schlens, and demanded proof of such assignment for their proper protection. They admitted that during the period within which the assignment from Knabes to Wolfe Bros. & Company was in existence, the Surety Company had remitted to them, as collected, the money received from said assets, and they filed a statement of receipts and disbursements of the sums collected. They denied any obligation on the part of the Surety Company according to the terms of said resolution "further than to account for the items of assets held by the said United Surety Company in trust for the owner thereof, according to the tenor of the two resolutions hereinabove referred to." In the tenth and eleventh paragraphs of the answer it was stated:

"That in connection with the transaction hereinabove referred to, these receivers call the Court's particular attention to the claim of the petitioner asserted

to the proceeds from a certain re-insurance agreement effective with the Munich Re-Insurance Company, a copy of which said agreement has already been filed in these proceedings to which reference is hereby made.

"That while it appears to have been the intention of the parties in the two resolutions referred to in the petition of said Gustave A. Schlens to create a charge upon the claim upon said re-insurance agreement growing out of the operation thereof, for the first two years of its existence, which said claim in the sum of $88,000 was then in suit in the Superior Court of Baltimore City; nevertheless such reinsurance may never be payable to these receivers, except in the discharge of claims against this estate, growing out of bonds in connection with which such re-insurance was effective, and these receivers, suggesting that there may be serious conflict of interest between those claiming under the terms of said resolutions and those whose bonds are re-insured by said agreement, submit their rights with respect thereto to this honorable Court in the light of the facts as they shall develop in the hearing hereof."

This answer was filed more than two years after the date of the appointment of the receivers, and it is reasonable to conclude that in that time they had thoroughly familiarized themselves with the affairs of the company, and knew pretty well what were its assets, and it is to be observed that the answer sets up no claim to the re-insurance contract—does not deny that it was held in trust by the company for the benefit of the Knabes or their assigns, and does not suggest that the Knabes were indebted in any way to the Surety Company, or that they held any claims of any kind which they were entitled to set off against them or their assignees. Nothing appears to have been done in Court in the matter of Mr. Schlens' petition until September, 1915—a period of more than two and a half years—when it was taken up for hearing. Mr. J. Kemp Bartlett then appears in the case as

co-receiver, and an amended and supplementary answer was filed. The substance of this answer is correctly and clearly stated in the brief of the appellant as follows:

It "admits that the resolution of February 3rd, 1910, was truly set out in the petition. It also admits the payment by Ernest J. Knabe, Jr., to the company of $75,000.00; it also admits that the receivers collected from the assets assigned to the Messrs. Knabe $51,268.85, and claims credit for payment amounting to $40,161.98, leaving a balance in the receivers' hands of $11,106.87. It sets out the following defenses:

"1st. That the resolution of February 3rd, 1910, was never properly reported or ratified;

"2nd. That the claim against the Munich Re-Insurance Company was never assigned to anyone;

"3rd. That the Messrs. Knabe never assigned the Munich claim to the petitioner;

"4th. That the Messrs. Knabe never possessed any right to the Munich claim which could be assigned;

"5th. That the resolution dated April 29th, 1910, set out in the petition, did not fully set forth the actual facts, but that the real action at the meeting was practically to relieve the Knabes from their obligation to pay $25,000.00 in consideration of their abandoning all claim whatever to the Munich Re-Insurance claim;

"6th. That the company had set-offs against the Knabes for amounts greater than the net amount of collections then in the receivers' hands.

"The only explanation which was given in the amended answer as to the reason why it should so differ from the first answer filed, was that the statement above quoted from the original answer, to the effect that the intention of the parties in the two resolutions referred to was to create a charge upon the Munich Re-Insurance claim,

'was an inadvertent error on the part of your respondents due to the fact that they had before

them at the time of the preparation of their said original answer, not the minutes of the meeting of the Board of Directors of said Company of April 29th, 1910, but only a copy of that portion of the minutes which had been previously prepared by the attorney of the said Ernest J. Knabe, Jr., and William Knabe, which portion of said minutes did not, as clearly as the context thereto, show the consideration for the release by the United Surety Company of the said Ernest J. Knabe, Jr., and William Knabe from their obligation to pay the said company the sum of twenty-five thousand dollars ($25,000.00) aforesaid.'

"No explanation whatever is attempted of the fact that in the first answer there is no suggestion that there is any set-off, while in the second answer it is stated that the amount of set-off is greater than the $11,000.00 and more, confessedly in the hands of the receivers."

The evidence shows that the "inadvertent error" mentioned in the answer was caused by the omission to file with the resolution of April 29, 1910, a copy of the note or memorandum placed by the secretary upon the minutes of that meeting under the circumstances stated, and which, we have said can not be taken to control or limit the legal effect of the resolution.

A great volume of testimony was taken—much of which came in subject to exception—and was afterwards stricken out. The Court found:

"1. That the petitioner is not entitled to any part of the proceeds of what is known as the 'Munich Re-Insurance Claim' now in the hands of the receivers.

"2. That the petitioner is entitled to the net amount in the hands of the receivers, of the proceeds of the items shown as 'Advance on Contracts,' 'Salvage' and 'Premium Over Ninety Days,' mentioned in the resolution of the United Surety Company, dated

February 3rd, 1910, less certain set-offs hereinafter mentioned.

"3.   That the net amount of the proceeds mentioned in the second paragraph hereof in the hands of the receivers is the sum of $11,106.87.

"4.   That the receivers are entitled to set-off against the said sum of $11,106.87, the premium on the bond executed by the United Surety Company on behalf of Ernest J. Knabe and William Knabe in favor of the Metropolitan Trust Company, which premium amounts to the sum of $1,150.00; that they are also entitled to set-off against said sum the sum of $3,000 paid by the United Surety Company to Messrs. Hershey, Farber and George D. Penniman as and for their fee for services rendered in connection with the said Metropolitan Trust Company bond; that they are also entitled to set-off against said sum the amount of the principal of the promissory note of Ernest J. Knabe and William Knabe in favor of the United Surety Company, said principal being the sum of $1,981.16, together with interest thereon from November 3rd, 1910, to the date of this decree, at the rate of six per cent. (6%) per annum.

"5.   That the receivers are not entitled to set-off against the aforesaid sum of $11,106.87, the other claims asserted by them against the said Ernest J. and William Knabe or either of them, or against the said Gustav A. Schlens in these proceedings."

And ordered and decreed (December 15, 1915):

"1.   That the receivers of the United Surety Company pay to the said petitioner the sum of $4,368.17 in full satisfaction of the amount to which said petitioner is entitled as assignee of all of the rights of Ernest J. Knabe and William Knabe under the resolution of February 3rd, 1910, as modified by the resolution of April 29th, 1910, and do also surrender to the said petitioner all collateral security in the hands of said receivers held by them as collateral to secure the pay-

ment of the aforesaid note for $1,981.16, dated November 3rd, 1910, drawn by Ernest J. and William Knabe in favor of the United Surety Company;

"2. That each side pay its own costs incurred in connection with this proceeding."

From this decree both parties have appealed.

There can, we think, be no doubt that Mr. Schlens is entitled to have paid over to him any sum now in the hands of the receivers realized from the assets designated "Advances on Contracts," "Salvage," and "Premiums over Ninety Days," unless that sum is subject to some or all of the set-offs claimed. Those items were sold to the Knabes by the resolution of February 3, 1910, and were assigned to Mr. Schlens subject to the claim of Wolfe Bros. & Company, which was paid in 1911.

Laying aside for the moment the consideration of the set-offs, the main question in the case is this: Is Mr. Schlens the equitable owner of the re-insurance claim and entitled to receive the net proceeds of that claim collected by the receivers? The determination of this question involves:

*First,* a construction of the two resolutions mentioned; and

*Secondly,* if the equity in that contract passed to the Knabes under those resolutions, was it assigned to Schlens? The resolutions are written instruments and constituted contracts between the Surety Company and the Knabes. It is, therefore, the duty of the Court to construe them—to ascertain the intention of the parties, and that intention must be gathered from the language of the resolutions, read in the light of the circumstances existing at the time. The rule of construction, as stated in *Nash* v. *Towne,* 5 Wallace, 699, is this: "Courts, in the construction of contracts, look to the language employed, the subject matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so

as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and the correct application of the language to the things described."

Examining these resolutions in the light of these principles it appears to be perfectly clear that the Re-Insurance Contract was sold to the Knabes. It is difficult to understand how it can be contended that the equitable ownership of this claim did not pass to them under the resolution of February 3, 1910. The statement of the president of the Surety Company at that meeting, the resolution itself—in which the Munich Re-Insurance claim is stated to be one of the assets sold—the note affixed to the annual statement for the year 1909 place the sale of this claim beyond dispute. Was that sale rescinded or modified by the resolution of April 29, 1910? In this connection several important facts must be borne in mind. The Knabes had paid $75,000 for the entire assets and were under an obligation to pay an additional $25,000—the balance of the purchase price. The Surety Company was under no obligation to repay, and the only security to which the Knabes could look for repayment was the assets sold. The best of these was the Re-Insurance Contract. The others were uncertain and hazardous, and, up to the present time the receivers have been unable to collect from these only about two-thirds of what the Knabes actually paid. The Knabes knew of the uncertain character of these accounts, and it is not reasonable to suppose that they would surrender the best security they had for the return of their money. The balance on the purchase was not due, and at that time the evidence shows the Knabes were able to pay, and would have been entitled to have received back from the proceeds collected, under the terms of the resolution of February 3, 1910, not only the $25,000 with interest, but one-third thereof as a bonus. The Insurance Commissioner was of opinion on February 3, 1910, that $75,000 was sufficient for the purposes of the company, and when the second resolution was passed Mr. Bowles had come into the company and it was evidently thought that it would

be to the interest of the company to release the Knabes from the payment of the balance of $25,000, and thereby free itself from the power of control reserved by the Knabes over the collection of the assets, and also to free itself from the obligation to pay out of the collections the bonus on the deferred payment. That resolution was passed to give effect to the agreement between the Knabes and Bowles which in effect provided that the *sale* of the "non-admitted" assets as per the resolution of February 3, 1910, *should remain in full force and effect.* Neither in the agreement nor in the resolution of April 29th is any reference made to the Re-Insurance contract, and the terms of the resolution, we think, negative the idea that it was the intention of the Knabes to re-assign or release their rights in the contract. After reciting the sale on February 3, 1910, of "certain so called non-admitted assets," which included the Munich claim, it provided that: "After the payment out of the first proceeds from the collections on all said 'non-admitted assets' of any balance of the seventy-five thousand dollars paid therefor, with interest, the company shall, out of all proceeds from said assets realized over and above such balance on seventy-five thousand dollars, with interest, pay one-third to the said Messrs. Knabe, their personal representatives and assigns, and two-thirds to the company. But such one-third going to the Messrs. Knabe shall not exceed twenty-five thousand dollars. All over and above that amount to go to the company also."

Without further discussion of this branch of the case we hold that by the true construction of the two resolutions referred to the equitable title to the Re-Insurance Contract vested in the Knabes.

Is that title now vested in Mr. Schlens? Upon this question little need be said. At the time the petition was filed he unquestionably held title to the other assets under the two assignments executed in March, 1910, subject, however, to the claims of Wolfe Bros. & Company which have long since been satisfied. And by the confirmatory agreement and

assignment dated May 10, 1915, the Munich claim was in express terms assigned to him.

As to the items of set-off filed by the receivers:

To the allowance of one of these—the sum of $1,981.16 with interest from November 3, 1910—the appellant makes no objection. None of the others commend themselves to the favorable consideration of the Court, and should not be al-. lowed. Not a single one was ever carried upon the books of the Surety .Company against the Knabes or either of them, and neither has ever recognized, or promised to pay anything, and no suit for the recovery of any of them was ever instituted. They had all accrued prior to April 29, 1910, and they are all barred by the Statute of Limitations, and none of them by any fair construction of the indemnity bond filed in the case are covered by it. Besides, they are mostly claims for unliquidated damages growing out of alleged torts, or breaches of duty of Ernest J. Knabe, Jr., and, for this reason, are not proper subjects of set-off. The rule governing the allowance of set-off was stated by Judge Alvey in *Smith* v. *Washington Gas Light Company,* 31 Md. 12, as follows: "Set-off in equity is allowed upon the same general principles as at law. There must be mutuality in the demands, and the amounts should be liquidated and certain. And while the practice in equity may be more liberal than at law, in respect to mutual credits, set-off can no more be allowed in equity than at law, in cases of demands for uncertain damages, as on breaches of covenant, or for torts. The principles governing Courts of Equity upon this subject, were very fully expounded by Chancellor Kent, in *Duncan* v. *Lyon,* 3 John. Ch. 359; and, in tracing the doctrine, the Chancellor says: 'The doctrine of set-off was borrowed from. the doctrine of compensation in the civil law. Sir Thomas Clarke shows the analogy, in many respects, on this point, between the two systems; and the general rules in the allowance of compensation, or set-off by the civil law, as well as by the law of those countries in which that system is followed, are the same as in the English law. To authorize a

set-off, the debts must be between the parties in their own rights, and must be of the same kind or quality, and be clearly ascertained or liquidated. They must be certain and determinate debts.' "

It is true that the Surety Company has paid large sums for attorneys' fees and traveling expenses in connection with certain acts of the Knabes alleged to be breaches of trust or acts of wrongdoing on their part. But their liability for these sums has never been determined, or the amount of damages sustained fixed, and they never have agreed to pay them.

At the date of the assignment to Mr. Schlens the Knabes were largely indebted to him, and he is entitled to be allowed out of the net funds in the hands of the receivers, collected from the said assets the balance advanced by the Knabes and not repaid to them, or on their account, and also one-third of the surplus, in accordance with the terms of the resolution of April 29, 1910.

The case will be remanded for the statement of an account in which all the set-offs, except the item of $1,981.16 with interest, will be disallowed.

> *Decree reversed and cause remanded, the appellee in No. 64 to pay the costs above and below.*