# DAVISON CHEMICAL COMPANY OF BALTIMORE COUNTY

*vs.*

# BAUGH CHEMICAL COMPANY OF BALTIMORE COUNTY.

*Contracts: construction; surrounding circumstances; chemical companies; "acid chamber." Obstruction of navigation: "U" boats.*

Courts, in construing contracts, look to the language employed, the subject-matter and the surrounding circumstances; they are never shut out from the same light which the parties enjoyed when the contract was entered into.          pp. 211-212

In the contract between the Davison Chemical Company and the Baugh Chemical Company, the term "chamber acid," in view of all the circumstances at the time of making the contract, is to be taken as meaning acid made from iron pyrites, and not from brimstone.                              p. 213

Where, owing to scarcity of tonnage owing to the "U"-boat campaign and war conditions, delivery of the raw materials to carry out a contract could not be obtained except at a prohibitive price, it was *held,* that the contract could not be enforced, especially where it contained a clause making it inoperative when navigation was obstructed on account of war or other uncontrolled causes rendering the buyer unable to receive or the seller unable to deliver.                          p. 218

*Decided June 20th, 1918.*

Appeal from Circuit Court No. 2 of Baltimore City. (DUFFY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Harry N. Baetjer* and *Charles McHenry Howard* (with a brief by *Venable, Baetjer & Howard*), for the appellant.

*Frank R. Savidge* and *W. Irvine Cross* (with whom was *Lee S. Meyer* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellee, the Baugh Chemical Company of Baltimore County, plaintiff below, is a corporation engaged in the manufacture of acid phosphate, and its plant is located in Baltimore County, Maryland, and the appellant, the Davison Chemical Company of Baltimore County, is a corporation engaged in the manufacture of sulphuric acid, and its plant is also located in Baltimore County. The chief materials used in the manufacture of acid phosphate, the product of plaintiff's plant, are sulphuric acid and phosphate rock, and for a number of years prior to the year 1913, the plaintiff had purchased the sulphuric acid required in the manufacture of its acid phosphate from the defendant. Sulphuric acid is made from sulphur, and originally, or in the early days, the raw material employed in the manufacture of that acid was native sulphur or brimstone. After the discovery of the sulphur bearing ore, called pyrites, containing about fifty per cent. of sulphur, it became the raw material generally used in the manufacture of sulphuric acid, particularly the low grade of acid used in the making of acid phosphate. Just when this change from brimstone to pyrites took place

is not definitely fixed by the evidence in the case, but the lower Court in its opinion stated that it was between 1880 and 1890. The chief supply of pyrites was imported from Spain, the supply from the Canadian mines and mines in this country being very small and those mines were generally owned or controlled and their product consumed by companies engaged in the manufacture of acid or acid phosphate.

In the early part of 1913, the plaintiff and defendant began negotiations for the purchase and sale of sulphuric acid, which resulted in a contract executed by them the 28th day of April, 1913, by which the plaintiff purchased from the defendant from thirty thousand to fifty thousand tons, of two thousand pounds each, of sulphuric acid per year, of the quality designated "Chamber acid ranging from 50 degrees to 54 degrees Beaume," to be delivered at the plaintiff's works at Canton, or to Baugh & Sons Company, Norfolk, Virginia, for a period of five years beginning January 1st, 1913, and ending December 31st, 1917, for the sum of $5.75 per ton. The contract provided that the plaintiff should declare on the 2nd of January of each year what amount in excess of the minimum amount of thirty thousand tons it would take that year, and that the deliveries of sulphuric acid should be made as nearly as possible in equal weekly instalments, and also contained the following provisions: "Fire, accident or strike, in the work of any of the parties herein mentioned; obstruction to navigation, accident to acid, barges, war, insurrections or other uncontrollable causes rendering buyers unable to receive or sellers unable to deliver, shall be good and sufficient reasons to make this contract inoperative during the period of necessary repairs, reconstructions, or continuance of the difficulties." Immediately following the execution of the contract, the price fixed thereby was by agreement reduced to $5.00 per ton.

In pursuance of the provisions of the contract, the plaintiff elected to take fifty thousand tons of acid per year, and it appears that the deliveries of the acid were accordingly and regularly made by the defendant during the years 1913 and

1914 and until sometime early in the year 1915. During the year 1915, the defendant failed to make full deliveries to the plaintiff, and in February, 1916, the plaintiff filed a bill in equity to compel the defendant to perform its contract. The defense in that suit was that by reason of a breakdown in its plant, and other causes, the defendant had not been able to make full deliveries to the plaintiff and other parties to whom it had sold sulphuric acid, and that it was therefore compelled to make a proportionate distribution of the product of its factory among them. In disposing of the case on May 18th, 1916, JUDGE BOND said that the evidence produced showed that there had been much interruption in the defendant's factory, due to accidents and breakdowns in its plant during the year 1915, "and up to this time," which cut down its capacity to an "extraordinary extent"; that as the defendant's contracts would have necessitated a full normal working of its plant, it was incapable by reason of such interruption of filling all of them; that the principle of "pro rating" should govern and determine the rights of the parties when the output is involuntarily reduced was in that case conceded; that the suspected improper preference of later buyers over the plaintiff had not been established by the evidence, and that he would sign an order dismissing the petition for a preliminary injunction. The case was never pressed to a final hearing, and the bill was later dismissed by the plaintiff, and on the 10th of November, 1916, the plaintiff brought suit at law against the defendant to recover damages for the non-delivery of acid in accordance with its contract up to and including June, 1916.

Interference with the importation of pyrites caused by the war, and which had diminished the normal supply during the year 1915, had largely abated during the fall of 1916 and the early part of 1917, and by reason thereof, and the extra efforts made by the defendant in anticipation of difficulty in obtaining the ore, it had in March, 1917, accumulated at its plant about forty-eight thousand tons. About that time, however, just preceding the entrance of this country into the war,

the interference with navigation occasioned by the German U-Boat campaign became very serious. The companies with which the defendant had contracted for delivery of the ore, and whose contracts contained a clause similar to the clause in the contract between the plaintiff and the defendant which we have quoted, notified the defendant that they would be compelled to suspend deliveries. After receiving this notice, and after making efforts to secure further deliveries of ore from the parties with whom it had contracted and from other sources, the defendant notified the plaintiff and all others with whom it had contracts for delivery of sulphuric acid that after the exhaustion of its accumulated stock of pyrites it would not be able to make deliveries of the acid contracted for, and would have to take advantage of the clause in its contract with the plaintiff authorizing a suspension of deliveries. At the same time the defendant stated that it would continue its efforts to secure pyrites, and continue to deliver to them their proportion of acid from any pyrites that it might be able to obtain, and offered to install in its plant brimstone burners, and to furnish the plaintiff and other parties to whom it had contracted to furnish acid, with brimstone acid, provided they would agree to pay the increased cost of the brimstone acid delivered in lieu of acid made from pyrites. All of the parties with whom the defendant contracted accepted the offer of the defendant and entered into agreements accordingly except the plaintiff, and on the 25th of September, 1917, the plaintiff filed in the Court below a bill of complaint against the defendant in which it prayed:

> "(a) That a decree may be passed commanding the said Davison Chemical Company of Baltimore County to specifically perform, keep and observe the several promises and agreements in the aforementioned contract set out to be performed, kept and observed, and commanding and directing the said defendant corporation, its officers, agents and servants, to make, during the time covered by said contract, the deliveries of acid to this plaintiff required by said contract.

"(*b*) That an injunction may issue strictly enjoining and prohibiting the said Davison Chemical Company of Baltimore County, its and each of its officers, agents and servants, from delivering during the terms covered by its said contract with the plaintiff any sulphuric acid to any parties with which it has entered into contracts on or subsequent to May 7th, 1915, while said Davison Chemical Company of Baltimore County is in default as to the delivery of any part of the sulphuric acid to which this plaintiff is entitled under said contract.

"(*c*) And that a preliminary injunction may issue strictly enjoining and prohibiting the said Davison Chemical Company of Baltimore County, its and each of its officers, agents and servants, from discriminating against the plaintiff in the distribution and delivery among its customers of the sulphuric acid manufactured by it from whatever raw material, and from withholding from this plaintiff any part of the fair and accurate pro rata share of the sulphuric acid manufactured by it until the further order of this Court."

On the same day the Court passed an order directing a preliminary injunction to be issued requiring the defendant to "proceed forthwith to fulfill the contract between the complainant and the defendant dated the 28th day of April, 1913, in accordance with its terms," and providing that "the deliveries be at the rate of 50,000 tons a year and that said deliveries be made weekly from this date, said deliveries to be made as nearly as possible in equal weekly installments of 961 tons each. Provided however, that if in each and any week commencing from the date of this order the defendant is unable to produce the entire output which it is normally capable of producing, or if for any justifiable cause the defendant is compelled to pro rate its weekly output among its customers, then the defendant may abate the number of tons furnished to the complainant in each week in the same proportion that the deliveries in such week to defendant's

other customers are abated." The order further required the defendant to "continue to make such deliveries until such contract is fulfilled, or until the further order" of the Court.

The defendant answered the plaintiff's bill and moved that the preliminary injunction be dissolved, and the testimony in this case was taken at the hearing of that motion. Upon the evidence produced at the hearing, and on the 3rd day of December, 1917, the Court overruled the motion to dissolve the injunction and, in accordance with the application of the plaintiff, modified its order of September 25th, 1917, granting the injunction to the extent of limiting the deliveries of sulphuric acid by the defendant to December 31st, 1917, or the further order of the Court. Nothing further appears to have been done in the case until it was submitted for final decree upon bill, answer and evidence taken at the hearing of the motion to dissolve, and the parties having agreed that after the issuing of the preliminary injunction on the 25th of September, 1917, and until December 31st, 1917, the defendant had delivered to the plaintiff sulphuric acid at the rate of 50,000 tons per annum, the Court passed the following decree from which this appeal was taken: "It is therefore, this 12th day of March, 1918, by the Circuit Court No. 2 of Baltimore City, adjudged, ordered and decreed, that the defendant under its contract with plaintiff and the evidence adduced was obliged to specifically perform and carry out said contract with plaintiff from the date of the filing of the bill on, and to deliver to plaintiff between September 25th, and December 31st, 1917, both inclusive, sulphuric acid at the rate of 50,000 tons a year and as nearly as possible in equal weekly installments of 961 tons each, irrespective of the raw material from which the said acid might be made; and that the injunction heretofore granted in this case on the 25th day of September, 1917, as modified by the order issued on the third day of December, 1917, be and it hereby is made perpetual."

The defense relied on by the appellant is that under its contract with the plaintiff of April 28th, 1913, it was not

required to deliver acid made from brimstone, and that as it was unable by reason of the war to obtain the necessary amount of pyrites to fulfill its contract with the plaintiff and other parties with whom it had contracted to deliver acid or acid phosphate, it was entitled under the provision we have quoted to suspend the deliveries of acid to the plaintiff to the extent of its inability to secure pyrites. The contention of the appellee is that the appellant was bound to deliver the acid to the amount specified in its contract, regardless of whether it was made from brimstone or pyrites, and, further, that the appellant by a proper effort could have obtained a sufficient amount of pyrites to enable it to comply with its contract. The learned Court below took the view that by reason of the conflict in the testimony as to the meaning of the words "chamber acid" the evidence produced by the defendant was not sufficient to establish a usage and to show that the trade meaning of the words "chamber acid" was acid produced from pyrites, and further held that the evidence showed that the defendant had not exercised due diligence to secure sufficient pyrites to enable it to fulfill its contract with the plaintiff, and that it had not made an effort to procure acid from other manufacturers of acid for that purpose. The effect of the preliminary injunction was to require the defendant during the period between the 25th of September and the 31st of December to supply the plaintiff with sulphuric acid made from brimstone or pyrites, at the rate of 50,000 tons a years, without regard to its ability to procure pyrites.

The pleadings, exhibits and testimony in the case cover about eight hundred pages of the printed record. It would necessarily greatly prolong this opinion to undertake to discuss this evidence, and we shall not attempt to do more than state the conclusion we have reached after careful examination of it.

It is apparent that the first and important question in the case involves the construction of the contract between the plaintiff and defendant of April 28th, 1913. A large part of the evidence was offered for the purpose of showing the

meaning of the words "chamber acid." The witness produced by the plaintiff testified that they mean acid manufactured by the chamber process from either pyrites or brimstone, while the evidence offered by the defendant tends to show that at the time the contract of 1913 was executed they were generally understood by those engaged in the manufacture or sale of acid and acid phosphate to mean the low grade of acid manufactured from pyrites by the chamber process. The precise question, however, to be determined is, What is the meaning of the words "chamber acid" as used in the contract between the plaintiff and defendant?

In the case of *Saunders Co. v. Ducker,* 116 Md. 474, this Court said: "It is an established canon of construction that, 'in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under which it was entered into. General or indefinite terms employed in the contract may be thus explained or restricted as to their meaning or application; and the contract must be so construed as to give it such effect and none other as the parties intended at the time it was made.' " * * * Contracts "must receive a reasonable construction so as to give effect to the intention of the parties thereto, and so as to carry out rather than defeat the purposes for which they were executed. They should neither, on the one hand, be so narrowly or technically interpreted as to frustrate their obvious design; nor, on the other hand, so loosely or inartificially as to relieve the obligor from a liability fairly within the scope or spirit of their term." And in the case of *Schlens v. Poe,* 128 Md. 352, the Court said: "It is, therefore, the duty of the Court to construe them (resolution)—to ascertain the intention of the parties, and that intention must be gathered from the language of the resolution read in the light of the circumstances existing at the time. The rule of construction, as stated in *Nash v. Towne,* 5 Wallace, 699, is this: 'Courts, in the construction of contracts, look to the language employed, the subject matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed

when the contract was executed and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and the correct application of the language to the things described.' "

The evidence in the case shows that in 1913 the defendant had been furnishing the plaintiff the acid used in the manufacture of its acid phosphate for a great many years; that with one or two minor exceptions sulphuric acid of the quality used in the manufacture of acid phosphate, and sold for that purpose, was made from pyrites ore, which contains about fifty per cent. of sulphur, by the process known as the chamber process, and that only about 5% of the brimstone or sulphur sold in this country was used for acid making, and that that per cent. of brimstone employed in making acid was used in the production of what was known as a high grade acid or brimstone acid, which was used for purposes other than the manufacture of acid phosphate. Doctor Grosvenor, one of the plaintiff's witnesses, testified that in 1913 the amount of brimstone or sulphur used in the manufacture of sulphuric acid was only about 5% of the raw material used for that purpose. The evidence further shows that the cost of the brimstone or sulphur in 1913 was about $22.50 per ton, while the cost of pyrites containing an equal amount of sulphur was about $11.00 a ton, and that the cost of the brimstone required to make one ton of acid was $5.15, while the cost of the pyrites necessary to make one ton of acid was $2.60 a ton. The undisputed evidence also shows that the officers of the plaintiff were at the time considering the advisability of manufacturing the sulphuric acid necessary for its own plant, and knew what it would cost to produce it, and that they were familiar with the construction of the defendant's plant, and knew that it was at that time only adapted to the production of sulphuric acid from pyrites. In view of this evidence it is impossible to escape the conclusion that when the plaintiff and defendant used the words "chamber

acid" to describe the subject matter of their contract they did not refer to acid made from brimstone, which they both knew the defendant could not produce in its plant as then constructed, and could not furnish at the contract price of $5.00 per ton. Whether, therefore, strictly and technically speaking, chamber acid may be said to include acid made by the chamber process from either pyrites or brimstone, if we are to give effect to the well established canon of construction to which we have referred arriving at the intention of the parties, it would seem reasonably clear that the contract referred to the kind of sulphuric acid that was almost universally employed in the manufacture of acid phosphate, and to the production of which the defendant's plant was adapted, and which alone the defendant could have furnished at the price agreed upon.

It would be giving the contract a strained and unreasonable construction to assume that the defendant obligated itself to deliver 50,000 tons of brimstone acid per year, through a period of five years and commencing at a date anterior to the date of the contract, when it knew and the plaintiff knew it could not do so except at a loss per ton equal to about one-half of the price agreed upon.

In regard to the second proposition, the evidence shows that in 1913 the capacity of the defendant's plant was about one hundred and seventy tons of sulphuric acid per year; that about the time it executed the contract with the plaintiff the defendant entered into a contract with the Pennsylvania Salt Manufacturing Company by which the latter company agreed to furnish the defendant "as near as possible in equal monthly quantities, delivered along side vessels at Curtis Bay, Baltimore, Md., their entire requirements of sulphur as pyrities, for use in their works at and near Baltimore, estimated as eighty thousand (80,000) tons of twenty-two hundred and forty (2240) pounds, for the calendar years of nineteen hundred and fifteen, sixteen, seventeen and eighteen (1915, 16, 17 and 18); said ore to be Spanish Smalls or Fines from the Rio Tinto Company's mines, to be shipped from port in

Huelva, Spain, and to average from forty-six (46) to forty-eight (48) per cent. of sulphur"; that the 80,000 tons of pyrites per year to be delivered by the Pennsylvania Salt Manufacturing Company would have been sufficient to produce 180,000 tons of sulphuric acid per year, and that that company had been supplying the defendant with its entire requirements for many years prior to 1913, and had never in the past failed to do so; that the defendant also entered into a contract with the Naylor, Benzon & Co., Ltd., of London, for 140,000 tons of pyrites ore, to be delivered during the years 1917, 1918, 1919 and 1920, a contract with the Pyrites Company, Limited, of London, for 20,000 tons of pyrites to be delivered during the years 1915 and 1916, and a further contract with the Pyrites Company, Limited, for 25,000 tons of pyrites, to be delivered during the year 1917; that the total importation of pyrites was about 1,300,000 tons per year, and that of that supply the three companies mentioned imported about one million tons per year. It further appears from the evidence that after the defendant received notice from these companies in the spring of 1917; that owing to the U-boat campaign and their inability to secure the necessary tonnage, they would have to suspend the deliveries of pyrites ore under their contracts, the president and officers of the defendant made repeated and weekly visits to New York to see the representatives of the companies mentioned to induce them to make deliveries, and that they also investigated the possibility of obtaining Canadian and domestic pyrites and found that it was impossible to secure any ore from that source; that they went to see the representatives of other importers of pyrites ore and were unable to obtain from them any deliveries; that to induce the representatives of the importers mentioned and other importers of pyrites to make deliveries they agreed to pay any additional freight charges that might be necessary to secure the requisite tonnage, and that the only pyrites they were able to obtain between April 20th and the time of the institution of the present suit consisted of two cargoes, one cargo from the Pyrites Company,

which was delivered in June, 1917, and one cargo from Naylor, etc., Company, delivered in July, 1917, both of which cargoes were used by the defendant in the manufacture of acid, and the acid was distributed among the parties with whom it had contracts including the plaintiff.

The evidence produced by the defendant tends to show that a number of other manufacturers of sulphuric acid or acid phosphate were able to secure pyrites, but it also appears that many of them were comparatively small manufacturers, and that in a number of instances they owned or controlled the domestic or Canadian mines from which they obtained the ore, and all of the evidence tends to show that there was great scarcity of pyrites during the time in which the plaintiff was unable to secure deliveries other than the two cargoes mentioned.

The learned Court below in its opinion referred to the fact that it did not appear that the defendant had instituted legal proceedings to compel the Pennsylvania Salt Manufacturing Company to comply with its contract, or that it had attempted to purchase sulphuric acid from other manufacturers with which to meet its obligation to the plaintiff.

In the case of *Herrmann* v. *Bower Chemical Mfg. Co.,* 242 Fed. Rep. 59, where the contract under consideration contained a clause like the clause in the contract between the plaintiff and defendant, the Circuit Court of Appeals approved the following instructions of the Court below: "Now, where a party enters into a contract providing for the delivery of certain articles of merchandise, he is obliged to use diligence to supply himself with sufficient quantities to carry out the terms of his contract, if he can do that in the exercise of due diligence. * * * So that the question for you to consider under all the circumstances are whether you are satisfied from the evidence that the defendant did use the diligence which I have stated, that is, the diligence which a reasonable prudent man, in good faith, desiring to carry out the terms of the contract, would exercise, in obtaining supplies necessary to proceed with the manufacture and delivery of the

prussiate of potash." In the case of *Simpson Bros. Corporation* v. *John R. White & Son,* 187 Fed. Rep. 418, the Court said in reference to a clause of a similar nature in a building contract: "In interpreting a clause of this character in a construction contract like that before us due regard must be had to the circumstances and to the ordinary course of business in contemplation of the parties at the time of the execution of the contract," and that a contractor in such a case is required to show that he had exercised ordinary diligence to secure the materials. In the case of *Jessup & Moore Paper Co.* v. *Piper,* 133 Fed. Rep. 108, the Court, dealing with a contract containing a clause excusing performance where the fulfillment of it was prevented by strikes or by hinderances beyond the control of the parties, said of the defendant: "It is bound to carry out its contracts even if with that clause in, so far as—at all events—to put forth all reasonable and proper exertion to overcome whatever hinderance may be offered to carrying out of its contracts—if—they could have obtained the cars for delivery to the plaintiffs by arrangement with the railroad company, they were bound to make it. They were bound, in other words, to do whatever was reasonable and proper to overcome whatever hinderance existed with regard to this car supply; and, if they failed to do whatever was reasonable and proper, whether it be the expenditure of labor and exertion, or the reasonable expenditure of money, then they have failed in the discharge of their duty, and to that extent they would be liable to respond to the plaintiff in damages. But if there was a scarcity of cars—a shortage of cars—and it was beyond their power—explaining as I have what their duty in that respect was—if it was beyond their power to remove that hinderance, if they gave the plaintiff its ratable share of cars during the period in question, then they certainly have discharged all their duty with reference to that part of the claim that they could be called upon to discharge." In the case of *Mineral Park Land Co.* v. *Howard,* 172 Cal. 289, the Supreme Court of California said: "The parties were contracting for the right to take earth and gravel

to be used in the construction of the bridge. When they stipulated that all the earth and gravel needed for this purpose should be taken from plaintiff's land, they contemplated and assumed that the land contained the requisite quantity, available for use. The defendants were not binding themselves to take what was not there. And, in determining whether the earth and gravel "were available," we must view the conditions in a practical and reasonable way. Although there was gravel on the land, it was so situated that the defendants could not take it by ordinary means, nor except at a prohibitive cost. To all fair intents then, it was impossible for defendants to take it. 'A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.' 1 *Beach on Contracts,* Sec. 216. We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligations more expensive than they had anticipated, or which would entail a loss upon them. But where the difference in cost is so great as here, and has the effect, as found, of making performance impracticable, the situation is not different from that of a total absence of earth and gravel."

Applying the principles stated in the cases referred to to the facts of this case, we think the evidence shows that the defendant did exercise all reasonable diligence in its efforts to secure the pyrites necessary to enable it to comply with its obligation to the plaintiff. The contract of the defendant was to deliver to the plaintiff the product of its plant, and the defendant was not required to purchase acid from other manufacturers in order to make deliveries to the plaintiff. It was bound to make every reasonable effort to secure the pyrites, and to pay any reasonable sum necessary to enable it to do so. The fact that the price of pyrites ore was greatly in excess of the amount that it had contracted to pay for it did not relieve the defendant of its duty to perform its contract. The evidence tending to show that other manufac-

turers of acid or acid phosphate had been able to secure some pyrites is not conclusive evidence that the defendant by the exercise of reasonable diligence could have obtained sufficient quantities of the ore to meet its obligations, or sufficient to overcome the positive evidence adduced by the defendant to show that it made every effort to obtain the ore.

The case of *Wilson & Co., Limited,* v. *Tennants,* reported in 1 K. B. (1917) 208, referred to by the Court below, was reversed on appeal by the House of Lords, and in the opinions of the majority of the Justices it was held that the evidence showed that the defendant was, within the meaning of the contract under consideration, prevented or hindered, because the cutting off of the German supply during the war left the defendant unable to secure enough of the articles to fill all of its contracts and supply its ordinary business. L. R. App. Cas. (1917) 495.

It follows from what we have said that the preliminary injunction should have been dissolved, and we must therefore reverse the decree from which this appeal was taken.

*Decree reversed, with costs and bill dismissed.*